**MOBIL OIL CORPORATION**

v.

**The UNITED STATES.**

No. 358–78.

United States Claims Court.

Aug. 1, 1985.

Charles C. MacLean, New York City, for plaintiff. Thomas J. Dubos, Fenton J. Burke, Joseph Angland, George G. Easley and Dewey, Ballantine, Bushby, Palmer & Wood, New York City, of counsel.

Betty N. Ferber, Washington, D.C., with whom was Acting Asst. Atty. Gen. B. John Williams, Jr., Washington, D.C., for defendant. Theodore D. Peyser, Jr., William B. Barker and Kevin B. Shea, Washington, D.C., of counsel.

## OPINION

MEROW, Judge.

In this action Mobil Oil Corporation (Mobil) seeks a refund of federal income taxes and interest for the years 1961 through 1969. During these tax years, Mobil filed consolidated federal income tax returns pursuant to section 1501 of the Internal Revenue Code of 1954. Upon an audit of the returns, the Internal Revenue Service (IRS) disallowed deductions for certain insurance premiums paid or ceded to Mobil insurance affiliates and included other such premiums in the income of members of Mobil's affiliated group as constructive dividends from certain foreign affiliates. The

present action involves liability determinations only. The issue of quantum was reserved for further proceedings, if necessary.

A trial was held and post-trial briefs have been submitted. For the reasons stated below, it is concluded that Mobil is entitled to a refund on the constructive dividend items, but is not entitled to a refund on the disallowed deductions.

FACTS[1]

<em>Introduction</em>

Mobil Oil Corporation, plaintiff, is a New York corporation. During the period 1959 through 1969 Mobil and a large number of its affiliates conducted an energy business in the United States and in foreign countries. The business included the exploration, production, transportation, refining and marketing of petroleum and natural gas and products thereof, and the manufacture and marketing of chemicals. Mobil Overseas Oil Company, Inc. (Mobil Overseas) was a wholly-owned domestic (Delaware corporation) subsidiary of Mobil organized in 1951. Mobil Overseas was primarily a holding company which owned the stock of Mobil affiliates organized outside the United States.[2] In 1957 Mobil Overseas' subsidiaries included very substantial companies such as: (1) Mobil Oil Aktiengesellschaft in Deutschland (MOAG), a wholly-owned subsidiary incorporated in Germany in 1899, (2) Mobil Oil Francaise, a company incorporated in France in 1904, (3) Mobil Oil Italiana Societa per Azioni (Mobil Oil Italiana), a wholly-owned subsidiary incorporated in Italy in 1935, and (4) Mobil Oil Company, Limited (Mobil Oil U.K.), a wholly-owned subsidiary incorporated in the United Kingdom in 1901. Mobil Overseas was responsible for coordinating the activities of these subsidiaries as well as for coordinating certain activities of other

---

**1.** The parties have submitted detailed requested findings of fact and objections only to certain of such requested findings or portions thereof. Those facts deemed necessary to the conclusion reached are here found in accordance with Rule 52(a). To the extent the submissions filed by counsel demonstrate no objection to any addi-

tional requested finding, that fact may, in any further proceedings, also be considered as found, pursuant to Rule 52, although not set forth in this opinion.

**2.** These affiliates are also referred to herein as Foreign Affiliates.

affiliates in the eastern hemisphere and Latin America. It provided financial and other advice to its affiliates. The affiliates' treasurers worked closely with Mobil Overseas' treasurers concerning cash flow policy. In 1959 Mobil Overseas was dissolved and its responsibilities were assumed by Mobil International Oil Company (Mobil International), a division of Mobil.

Prior to 1960 Mobil had an overall corporate policy of self-insuring most major property/casualty risks. This policy was applicable to Mobil Overseas and was recommended to its subsidiaries. The self-insurance program included rating casualty exposures and accruing reserves for self-insured expenses.

Disregarding the corporate policy in favor of self-insurance, prior to 1960 Mobil Overseas' affiliates had purchased substantial amounts of insurance from companies such that they were largely "outside insured." Most foreign affiliates were in a tight position financially and had increased greatly their outside insurance either from prudence or at the insistence of their creditors. Despite such insurance coverage, a question existed whether Mobil Overseas and its affiliates were adequately protected in view of the risks involved in their operations. The outside insurance purchased by Mobil Overseas affiliates was not bought efficiently. The affiliates received no centralized guidance with respect to their insurance programs. Each affiliate purchased on the local market and many affiliates did not employ trained insurance buyers. Insufficient advantage was taken of the widespread risks and mass purchasing power that the Mobil Overseas' affiliates could marshal.

### Adams Report

Concerned with these problems, in 1958 Mobil Overseas reviewed the insurance programs of its affiliates. Mr. Faneuil Adams, an assistant to the financial director of Mobil Overseas, conducted a study of risk management practices, including insurance and self-insurance programs, and explored possible solutions. The object of the study was to discover the insurable values and current insurance practices and problems of the Mobil Overseas affiliates.

Mr. Adams gathered data concerning the insurance needs and practices of the Mobil Overseas affiliates which accounted for the largest outside premium amounts, some 80 percent of those paid in 1956. These affiliates were MOAG, Mobil Oil Francaise, Mobil Oil Italiana, and Mobil Oil U.K. The data included: (a) the estimated amount of insurable risks; (b) the nature of the insurance purchased to cover such risks; (c) the administrative methods for handling the affiliates' current insurance or self-insurance programs; (d) the insurance or self-insurance practices of other oil companies; and (e) insurance, currency and tax regulations in the United Kingdom, France, Germany and Italy, including a review of the extent to which commercial insurance was required by law, regulation, business custom, leases, etc. and the tax treatment of self-insurance and commercial insurance premiums and losses. Mr. Adams consulted with insurance brokers and agents in New York, London and Europe; he travelled to Europe to visit the major affiliates of Mobil Overseas; he discussed the insurance practices of these affiliates with those responsible for the affiliate's insurance affairs.

The relative merits of the risk management alternatives were judged, in part, by comparing the after-tax cost under each method at various "loss ratios." "Loss ratio" is the relationship which annual losses in assets bear to the cost of outside insuring those assets at their full economic value (usually replacement cost less physical depreciation).

Based upon the study, Mr. Adams prepared a report (Adams report) for the board of directors of Mobil Overseas. The Adams report concluded the methods of Mobil Overseas and its affiliates of insuring against physical damage should be revised. The report stated (in part):

> Mobil Overseas should reaffirm its basic policy of self insurance. Specifically, we should:

a. Form an insurance affiliate to cover our risks where possible.

b. Where this is not possible, ask the affiliates to increase local self insurance substantially, assuring them that funds to cover major self insured losses will somewhere be found.

Regarding the tax treatment of risk management approaches, the report concluded that (a) in the United Kingdom, France, Germany and Italy, outside premiums could be taken as a current expense; (b) a gain or loss of income was recognized to the extent that insurance recoveries were greater or lesser than book values; (c) self-insurance premiums could not be taken as a current expenses, but losses could be written off at book values; and (d) in the United Kingdom, apparently no loss could be taken on nonindustrial capital assets, and certain third-party claims might not be recognized as a loss for tax purposes.

The Adams report recognized that the cost savings of an insurance affiliate over outside insurance was due, in part, to the fact that the insured affiliates and the insurance affiliate were treated as one economic entity which retained the premiums. However, it also recognized that the above stated premise would have to be modified since Mobil Overseas and its affiliates operated under a multiplicity of national corporate, tax, insurance and currency regulations.

The Adams report also recognized that the cost savings of an insurance affiliate over self-insurance was due, in part, to the fact that premium payments to an insurance affiliate were tax deductible whereas premium accruals to a self-insurance program were not.

### GOIC and Bluefield

The concept set forth in the Adams report, as approved by the board of directors of Mobil Overseas and the relatively autonomous affiliates of Mobil Overseas, led directly to the incorporation in the Bahamas of General Overseas Insurance Company, Limited,. (GOIC), an insurance affiliate.

The Bahamas was chosen as the place of incorporation for legitimate business reasons. The Bahamas is a sterling area jurisdiction and it was contemplated that a major portion of GOIC's premiums would be sterling currency. In addition, it was assumed GOIC would be incorporated in a jurisdiction where there would be no local tax on premiums received and the Bahamas imposed no such tax. It was anticipated, however, that there would eventually be a 54 percent tax on profits remitted to the United States as dividends; but it was assumed that profits earned by the insurance affiliate would be held as insurance reserves or reinvested abroad for the indefinite future.

GOIC was a wholly-owned subsidiary of Mobil Holdings (Bahamas), Ltd., a Bahamian corporation and a wholly-owned subsidiary of Mobil Overseas Oil Company, Inc. The name of Mobil Holdings (Bahamas), Ltd. was changed to Pegasus Fund, Ltd. in 1963 and to Pegasus Overseas, Ltd. (Pegasus) in 1967. Pegasus subsequently became a direct subsidiary of Mobil. GOIC remained a subsidiary of Pegasus and Pegasus remained a subsidiary of Mobil through 1968 when GOIC was liquidated because of concern over the political stability of the Bahamas. At the beginning of 1968, Bluefield Insurance Limited (Bluefield), a second-tier Bermuda subsidiary of Mobil, commenced writing insurance and reinsurance comparable to that previously written by GOIC.

Bluefield was incorporated in Bermuda on August 4, 1966. On March 23, 1967 Bluefield's stock was acquired by Mobil Investments S.A., a Panamanian corporation, all of the stock of which was owned by Mobil indirectly. On December 8, 1967 Bluefield's stock was acquired from Mobil Investments S.A. by Mobil Oil Holdings S.A., a Luxembourg corporation, all of the stock of which was owned by Mobil indirectly. Bluefield's offices were in Hamilton, Bermuda. Bluefield remained a subsidiary of Mobil Oil Holdings S.A. through 1969. All the stock of Mobil Oil Holdings

S.A. was owned by Mobil directly or indirectly through 1969.

Upon incorporation, GOIC's initial capitalization was 50,000 one pound par value shares, of which one shilling per share was paid in. The contributed capital as of December 31, 1959 was $7,021.88 and GOIC's net worth was $326,396.16. With the additional 19 shillings per share called in, this amounted to a capital account of approximately $140,437.60. In December 1960 GOIC's capital was increased by approximately $5,460,144.60 by its stockholder Mobil Holdings (Bahamas) Ltd. On December 28, 1962 GOIC's capital was increased once again by Mobil Holdings (Bahamas) Ltd., by approximately $4,200,000.

As of December 31, 1968 Bluefield's balance sheet showed capital stock of $12 million, surplus of $10,695,582, cash of $20,611,444, accounts receivable from other than affiliates of $2,159,779, notes receivable from affiliates of $12 million, collateral deposits for affiliates of $3,016,000 and accounts receivable from affiliates of $242,966.

Based on a recommendation by Alexander & Alexander, Inc., a firm of outside unrelated insurance brokers, from the time GOIC began doing business until late 1960, GOIC carried catastrophe reinsurance[3] in excess of a deductible of $1 million. Thereafter, the $1 million figure was increased to $5 million; GOIC carried reinsurance which protected it against any loss in excess of $5 million on insurance written by it. Mobil's insurance department and GOIC engaged in a combined negotiation effort to obtain GOIC's catastrophic insurance. Bluefield carried like reinsurance from the date it commenced business through 1979.

GOIC and Bluefield were separate corporations whose employees and offices were located in the Bahamas and Bermuda, respectively. Both companies were managed in accordance with standard insurance practices. GOIC and Bluefield wrote both direct insurance and reinsurance. GOIC's and Bluefield's business basically consisted of three different segments. First, each wrote direct insurance for insureds doing business in foreign countries which did not require a primary insurer to be admitted to do business therein. Second, in foreign countries where GOIC and Bluefield were unable to write direct insurance, arrangements were often made with unrelated insurance companies which were admitted insurers in such countries whereby such companies wrote direct insurance with respect to foreign risks of Mobil affiliates, and GOIC or Bluefield reinsured a portion of such coverage. Third, from December 1960 through 1970, the American International Reinsurance Company, Inc. (AIRCO), wrote insurance with respect to the United States risks of Mobil Oil Corporation and its affiliates, and GOIC and Bluefield reinsured most of that coverage.

Prior to 1961 Mobil had been unable to place 100 percent of its catastrophe risks in the insurance market. In 1961, for the first time, 100 percent placement of the catastrophe reinsurance risk was achieved. This was possible in part by the existence of GOIC, which obtained access to a wider catastrophe insurance market. The cost of such coverage to GOIC was less than it would have been if it had been purchased separately or directly by Mobil and its affiliates.

The expenses for GOIC and Bluefield, wholly-owned insurance affiliates, were considerably lower than expenses of an unrelated insurance company. GOIC and Bluefield did not generally pay commissions in respect to their direct insurance. Administrative expenses were also less. In terms of commercial insurance expectations, GOIC's and Bluefield's profits were extraordinarily high.

The funds accumulating in GOIC and Bluefield were used for loans to other Mobil Overseas affiliates. For example, during 1962 GOIC lent close to $2 million to Mobil Oil Liberia, Incorporated. Over 60 percent of GOIC's notes receivable on December 31, 1962 were loans to affiliates. On December 31, 1962 GOIC had total as-

---

**3.** Catastrophe reinsurance is excess loss reinsur- ance obtained from unrelated insurers.

sets of $19,783,254, including $12,940,833 in time deposits and bank acceptances, $4,721,282 in notes receivable from both wholly- and partly-owned affiliates and cash of $938,182.

In 1963 and 1964, there was a change in policy and the loans were assigned to the parent company of GOIC, Pegasus. At that time GOIC began investing in Pegasus. During 1964 and 1965 GOIC began to make substantial deposits with the First National City Company. These deposits served as security for a line of credit to Mobil affiliates. At the same time GOIC began to place funds in the Commercial Exchange Bank and Trust Company, a Mobil affiliate. Bluefield continued GOIC's practice with respect to loans and financing arrangements with Mobil affiliates. By 1966 over 50 percent of GOIC's total investments were committed to Mobil Oil interests.

*Risks Protected By GOIC and Bluefield*

At the time of GOIC's incorporation, it was contemplated that it would underwrite risks for operating companies abroad that were affiliated with Mobil Overseas. During 1959 and 1960 GOIC wrote both direct insurance and reinsurance with respect to Mobil's foreign risks, *i.e.*, hazards, risks, losses or liabilities not within the United States.

Where a foreign affiliate could not insure with GOIC or with an insurance company which could reinsure with GOIC, Mobil Overseas recommended that the affiliate increase its local insurance substantially. Specifically, it was recommended that Mobil Overseas issue guarantee letters to be sent to such companies and that outside catastrophic insurance be obtained. Mobil Overseas would give the affiliate assurance that funds to cover major self-insured losses would be provided. In instances where the Mobil Overseas' affiliates did not insure with GOIC or with an independent insurance company which reinsured with GOIC, GOIC issued an insurance policy relating to the affiliate's exposures to Mobil Oil Corporation, as stockholder of the affiliate. GOIC billed Mobil Oil Corporation for the cost of such coverage and carried catastrophic reinsurance with respect to such coverage.

The Mobil Overseas affiliates which received primary insurance from an insurance company unrelated to Mobil, which reinsured with GOIC, were aware of the reinsurance arrangement with GOIC. When Mobil Oil Corporation or an affiliate entered into an arrangement with a primary insurer, GOIC was obligated as a matter of corporate policy to take the reinsurance package from the primary insurer. This policy was subject to the condition that the package contain no conditions which would be detrimental to GOIC's performance. Notwithstanding the existence of GOIC, division managers of Mobil were free to obtain insurance from an outside insurance company when there was a commercial need or a practical business reason for such insurance.

In a study dated February 16, 1959 Mr. Adams suggested investigating the possibility of GOIC insuring Mobil's assets in the United States. Mr. Adams indicated the savings of such action as follows:

"POSSIBLE SAVINGS BY INSURING DOMESTIC ASSETS
WITH GENERAL OVERSEAS
($ 000)

| | | | | | | |
|---|---|---|---|---|---|---|
| (a) | Premium | 5 000 | 4 000 | 3 000 | 2 000 | 1 000 |
| (b) | Claims (50% loss ratio) | 2 500 | 2 000 | 1 500 | 1 000 | 500 |
| (c) | Balance | 2 500 | 2 000 | 1 500 | 1 000 | 500 |
| (d) | Increased US tax deduction-net saving if no US tax on General Overseas income | 1 350 | 1 080 | 810 | 540 | 270 |
| (e) | Net saving if US tax 15% of (a) | 600 | 480 | 360 | 240 | 120 |
| (f) | Net saving if US tax 30% of (a) | (150) | (120) | (90) | (60) | (30)" |

In subsequent GOIC status reports the tax savings summarized in this study were characterized as follows: "With a 50% loss ratio (loss experience over a number of years as a percent of premiums paid), it is estimated that Socony [Mobil] could realize an annual U.S. tax saving of $1,350,000."

In late 1960 Mobil commenced insuring United States risks with AIRCO, an unrelated insurance company, which almost entirely reinsured the same with GOIC. Mr. Ernest Stempel, the AIRCO official who helped negotiate the agreements to insure Mobil's United States risks and largely to reinsure them with GOIC, did not investigate the financial condition of GOIC, including its capital and surplus condition, as he would have ordinarily done before contracting with a reinsurer. Mr. Stempel believed a detailed investigation unnecessary because he knew GOIC was a 100 percent-owned subsidiary of Mobil and because he was aware of GOIC's catastrophic reinsurance. Mobil decided AIRCO should write the direct coverage and that GOIC should reinsure because, among other things, of certain state regulatory consequences which might require GOIC to be admitted to do business in the United States. The reinsurance agreement provided (a) AIRCO to cede and GOIC to accept 98 percent of the liability for the first $5 million of any one loss on insurance issued by AIRCO to Mobil and its affiliates, and all liability for losses in excess of $5 million, (b) AIRCO to pay GOIC 98 percent of all premiums received from Mobil, (c) GOIC to pay AIRCO a commission of 1 percent on the premiums it received from AIRCO, (d) AIRCO to pay GOIC 2 percent of the premiums paid by GOIC for catastrophe reinsurance covering losses in excess of $5 million on risks insured by AIRCO, and (e) AIRCO to retain a reserve fund of $200,000 out of premium payments due to GOIC, which fund was for use in paying small claims. The agreement also limited AIRCO's liability to $100,000 for any one loss or series of losses arising out of any one event or occurrence. With respect to large claims and in accordance with standard insurance practice, AIRCO had the right to call on GOIC for payments of GOIC's share of such claims prior to making payment to Mobil. Claims which did not come within the "cash call" provisions could be paid out of a $200,000 reserve fund retained by AIRCO.

Bluefield entered into a similar reinsurance agreement with AIRCO, effective January 1, 1968. AIRCO requested a guarantee from Mobil with respect to Bluefield's obligations, but Mobil refused to give such a guarantee and AIRCO proceeded without one.

The major portion of GOIC's and Bluefield's business consisted of reinsurance of risks of Mobil Oil Corporation and its affiliates. GOIC and Bluefield normally did not write reinsurance with respect to the risks of parties other than Mobil Oil Corporation or its affiliates unless the risks bore some relationship to a business activity of Mobil Oil Corporation or one of its affiliates. These parties included: "parties that had a business relationship with a Mobil compa-

ny," "corporations which were owned in part by parties unrelated, directly or indirectly, to Mobil by stock ownership," "unincorporated ventures in which a Mobil affiliate and one or more parties unrelated by stock ownership to Mobil were participants," "builders all risk policies issued in the names of Mobil affiliates and the affiliate's contractors," "insurance or reinsurance covering property belonging to employees of Mobil and its affiliates," "marine cargo shipments for the account of unrelated parties where Mobil Oil was selling the products shipped," "premiums ceded by Bishopsgate to GOIC and Bluefield that were attributable to fire insurance and fire reinsurance written by Bishopsgate."

GOIC and Bluefield both insured and reinsured a wide variety of risks of numerous Mobil affiliates. In 1959, its first year of business, GOIC wrote Fire & Extended Coverage, General Third Party Liability (Public Liability), Marine Hull and Protection & Indemnity and Marine Cargo insurance. By the end of 1961 GOIC also wrote Fidelity Guaranty, Cash in Transit, Employer's Liability and Workmen's Compensation, Motor Vehicle, Burglary and Aviation Hull insurance. By the end of 1965, GOIC had commenced writing Fire & Business Comprehensive, Goods in Transit, Oil Well Drilling, Motor Traders Risks insurance and Builder's All Risks insurance. In 1966, GOIC began to offer Contingent Liability and Indemnity insurance. All the foregoing classes of business were written both direct insurance and reinsurance, except that Aviation Hull Risks was written only on reinsurance. In 1968 through 1979 Bluefield wrote essentially the same lines.

During 1961 GOIC had outstanding over 300 direct insurance policies which had been issued to over 55 Mobil affiliate insureds. By 1965 GOIC had outstanding over 375 direct insurance policies which had been issued to over 75 Mobil affiliates. In addition, during 1961 and 1965 GOIC reinsured the risks of a number of other insureds. GOIC's insureds and reinsureds did business in over 40 countries and territories in 1961, and in over 50 countries and territories in 1965. During 1969, Bluefield

had outstanding over 390 direct insurance policies which had been issued to over 60 insureds, and it reinsured a portion of the risks of at least 60 other insureds. Bluefield's insureds and reinsureds did business in over 60 different countries and territories.

During the period 1961–69 the primary insurance written by AIRCO for Mobil Oil Corporation and its affiliates generally covered all United States risks of Mobil and its affiliates. Premiums earned by GOIC and Bluefield other than premiums earned with respect to their AIRCO business were generally attributable to the insurance or insurance of foreign risks during the period 1961–67.

*Bishopsgate and Westchester:*

Bishopsgate Insurance Company, Limited (Bishopsgate), an active insurance company incorporated in the United Kingdom in 1939, was acquired by Mobil in 1962. Bishopgate remained a subsidiary of Mobil Holdings, Ltd., a United Kingdom corporation, and Mobil Holdings remained a wholly-owned subsidiary of Mobil until December 1969. Bishopsgate was acquired by Mobil Holdings for the principal purpose of having it write various types of insurance for Mobil affiliates and others in the United Kingdom and Europe. At the time of its acquisition, there was a growing consensus that the United Kingdom would join the European Common Market and a concern that, if this should happen, GOIC would encounter increasing difficulties doing business in that market. It was anticipated that Bishopsgate would be able to conduct such business without encountering these difficulties.

Between 1962 and 1969 Bishopsgate's registered office was in the United Kingdom. However, after its acquisition by Mobil Holdings, Bishopsgate established branch offices in Melbourne and Sydney, Australia. Bishopsgate primarily insured marine and fire risks. From 1963 to 1970 Bishopsgate continued in the insurance business and wrote most classes of insur-

ance and reinsurance (except life and pensions) with respect to risks of Mobil affiliates, and risks of parties unrelated to Mobil.

Westchester Insurance Company (Proprietary) Limited (Westchester), was acquired in 1962 when Mobil acquired all the stock of Mobil Petroleum Company, Inc., a Delaware corporation, in connection with the division of Standard-Vacuum Oil Co. between Mobil and Standard Oil Company of New Jersey as a result of antitrust proceedings. Prior to 1969 Westchester was a subsidiary of Standard-Vacuum Oil Co., which was 50 percent owned by Mobil. Westchester engaged in the insurance business, principally in South Africa. Its principal office was in Cape Town, South Africa. Westchester remained a subsidiary of Mobil Petroleum Co., and Mobil Petroleum Company, Inc. remained a subsidiary of Mobil through 1969. During the years 1962–69, Westchester wrote lines of insurance similar to those written by GOIC and Bluefield, principally for Mobil affiliates in southern Africa, including Mobil Oil South Africa (Proprietary) Limited and Mobil Refining Southern Africa (Proprietary) Limited, wholly-owned South African subsidiaries of Mobil.

After the Standard Vacuum split of 1962, Westchester, for a short time, continued to insure the companies that were acquired or retained by Mobil. Subsequently, the majority of companies were insured by GOIC. Companies that were not retained by Mobil were not so insured.

## PARTIES' CONTENTIONS

The major issue in this case is whether payments by Mobil Overseas and its affiliates in return for formal insurance contracts constitute a deductible expense for federal income tax purposes.

Defendant maintains that they do not. To support its position over plaintiff's objection, defendant was allowed to present the testimony of Dr. Irving Plotkin, who was qualified as an expert in the economics of insurance. Dr. Plotkin testified that Mobil did not actually purchase insurance as the term is defined in the field of economics. Essentially, Dr. Plotkin testified that a wholly-owned subsidiary cannot insure its parent because there is no risk transference. The risk of loss remains within the economic unit. As a shareholder of a wholly-owned insurance affiliate, the parent company bears the risks of the subsidiary, suffers from losses sustained by the subsidiary, and benefits from gains realized by the subsidiary. Defendant maintains, to the extent that a wholly-owned insurance subsidiary is "on risk" for his own account as an insurer without reinsurance protection or as a reinsurer, the parent corporation is "on risk" as the captive's financial supporter. Since insurance requires transfer of risk of loss away from the insured, a parent cannot purchase insurance from a wholly-owned affiliate.

Plaintiff maintains that the premiums paid to the insurance affiliates are deductible. Plaintiff contends that defendant's position disregards the doctrine of separate corporate entities and that insuring through an affiliated corporation is no different from other legally acceptable transactions between affiliated corporations. To support its position, plaintiff presented testimony regarding the operations of the insurance companies.

## DISCUSSION

### Deductions

The issue to be resolved is whether Mobil sufficiently transferred the risk of loss to constitute insurance. This issue has been addressed recently in several cases.[4] With

---

**4.** *Carnation Co. v. Commissioner,* 640 F.2d 1010 (9th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381; *Stearns-Roger v. Commissioner,* 577 F.Supp. 833 (D.Colo.1984); *Beech Aircraft Corp. v. United States,* 84–2 USTC ¶ 9803 (D.C.Kan.1984); *Crawford Fitting Co. v.*

*United States,* 606 F.Supp. 136, 85–1 USTC ¶ 9189 (N.D.Ohio 1985); *Clougherty Packing Co. v. Commissioner,* Docket No. 1954–82, 84 T.C. ——, No. 61 (May 20, 1985), P.H.T.C. ¶ 85.61 (1985).

one exception,[5] each decision has disallowed the deduction. The analysis has focused on the legal definition of insurance and whether the parent corporation actually transferred risk of loss.

Insurance is a unique risk transfer device. Other situations involving transfers between related corporations which are acceptable for tax purposes are not relevant. The unique status of insurance is reflected in the fact that the term has never been defined by the Internal Revenue Code or in the Regulations. In addition, insurance has been defined only broadly by the courts as requiring risk-shifting and risk distribution. *See Helvering v. LeGierse*, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941); *Commissioner v. Treganowan*, 183 F.2d 288 (2d Cir.1950), *cert. denied*, 340 U.S. 853, 71 S.Ct. 82, 95 L.Ed. 625. As an alternative to obtaining insurance against potential losses, a corporation may set aside a reserve for such losses. Under this practice, the corporation does not transfer the risk.

The cases disagree on what is required to shift the risk of loss sufficiently to constitute insurance. In the first case to consider the issue of insurance of a parent by a wholly-owned affiliate, the court focused on the interdependence of the insurance contract and the parent's contractual obligation to capitalize the captive insurance company. *Carnation Co. v. Commissioner*, 640 F.2d 1010 (9th Cir.1981), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381. Carnation incorporated a wholly-owned Bermuda subsidiary, Three Flowers, to insure and reinsure various multiple line risks. Carnation insured with an unrelated insurance company, American Home, who reinsured 90 percent with Three Flowers. As a condition to insurance with American Home, Carnation agreed to capitalize Three Flowers up to $3 million at the election of Carnation or at the request of American Home. In reviewing the Tax Court decision, the Ninth Circuit considered the insurance agreement and capitalization agreement together.

The court determined the two agreements neutralized the risk to the extent American Home reinsured with Three Flowers and disallowed the deduction for 90 percent of the premium payments.

In deciding the issue, the court compared the situation to *Helvering v. LeGierse*, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941). In *LeGierse* an 80 year old woman simultaneously executed two contracts with her insurance company. One was a single premium life insurance policy and the other was a standard form lifetime annuity. Although both contracts were distinct, the insurance company would not issue one without the other. The Supreme Court held that there was no life insurance regardless of the existence of a life insurance policy, stating "Historically and commonly insurance involves risk-shifting and risk-distributing." 312 U.S. at 539, 61 S.Ct. at 649.

In *Carnation, supra*, the court also noted that its situation was identical to situation 2 in Revenue Ruling 77–316, 1977–2 C.B. 53. This states:

> Domestic corporation Y and its domestic subsidiaries paid amounts as casualty insurance premiums to M, an unrelated domestic insurance company. This insurance was placed with M under a contractual arrangement that provided that M would immediately transfer 95 percent of the risks under reinsurance agreements to S2, the wholly owned foreign "insurance" subsidiary of Y. However, the contractual arrangement for reinsurance did not relieve M of its liability as the primary insurer of Y and its domestic subsidiaries, nor was there any collateral agreement between M and Y, or any of Y's subsidiaries to reimburse M in the event that S2 could not meet its reinsurance obligations.

The next case to consider the issue was *Stearns-Roger Corp. v. United States*, 577 F.Supp. 833 (D.Colo.1984). In that case Stearns-Roger, a company which designs and manufactures large mining, petroleum

---

**5.** *Crawford Fitting Co. v. United States, supra.*

and power generating plants, formed a captive insurance company, Glendale Insurance Company. Glendale issued insurance policies covering Stearns-Roger, its 15 subsidiaries, and its project customers. The district court determined that Glendale was a bona fide insurance company, that Glendale was formed to satisfy a legitimate business purpose, that each company was a separate corporate entity, and that Stearns-Roger's payments to Glendale were reasonable. Notwithstanding the above, the court held the payments were not deductible because the agreement between Glendale and Stearns-Roger did not shift the risk of loss. The court stated:

Here Glendale Insurance Company is not in the business of insuring "others." Its only business is to insure its parent corporation which wholly owns it and ultimately bears any losses or enjoys any profits it produces. Both profits and losses stay within the Stearns-Roger "economic family." In substance the arrangement shifts no more risk from Stearns-Roger than if it had self insured.

577 F.Supp. at 838.

In *Beech Aircraft Corp. v. United States,* 84–2 USTC ¶ 9803 (D.C.Kan.1984) the district court held premiums paid to a captive insurance company were not deductible. In *Beech,* the parent corporation formed a captive insurance company, Travel Air, "to obtain products liability insurance and provide, by attorneys of its selection, defenses of such actions superior to that provided by commercial insurance carriers." 84–2 USTC at 85,403. Unlike in *Carnation, supra,* there was no evidence that Beech made any guarantees that it would pay losses which were greater than Travel Air's reinsurance, or that Beech agreed to enlarge Travel Air's capital structure. However, Travel Air had only $150,000 in capital and purported to cover a loss of several million dollars excess coverage. In disallowing the deduction, the court stated:

4. The imposition of a tax must be based on economic reality and the incidence of taxation depends upon the substance of the transaction and the rela-

tionship of the parties. Here the gain or loss enjoyed or suffered by Travel Air is reflected directly on the net worth of the parent Beech. *National Farmers Union Service Corp. v. U.S.,* 400 F.2d 483, 485 (10th Cir.1968).

5. There was no real transfer of risk under the agreement to afford excess coverage for the last part of 1972. Travel Air had a capitalization of not more than $150,000.00. It purported to cover a loss of several million dollars excess coverage. Only Beech could have responded to such a loss had such occurred.

6. As a matter of economic reality, if and when a loss occurred and was paid by Travel Air, the net worth of Beech was reduced to approximately the same extent as though Beech had paid the loss itself. While these arrangements had the appearance of insurance, in reality Beech still carried the risk. *Carnation Company v. Commissioner,* 640 F.2d 1010 (9th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381.

7. The transaction between Beech and Travel Air, as disclosed by the evidence and the record in this case, did not constitute insurance in reality, and Beech is not entitled to deduct the payments made to Travel Air, its captive insurance company, as insurance premiums, and thus be a legitimate business expense. Compare *Stearns-Roger Corp. v. U.S.,* 577 F.Supp. 833, U.S. District Court for Colorado (decided January 10, 1984).

84 USTC at 85,404.

In *Crawford Fitting Co. v. United States,* 606 F.Supp. 136, 85–1 USTC ¶ 9189 (N.D.Ohio, 1985), the court considered the interrelationship of the insured and insurer and determined they were sufficiently removed to achieve transfer of the risk of loss. The insured corporation was not the parent of the captive. In *Crawford,* Crawford Fitting Company purchased insurance from Constance Insurance Company (Constance). Fred A. Lennon, his wife, Alice P. Lennon, and daughter, Catherine Lennon

Lozick, were the shareholders of Crawford Companies. Crawford Companies included four separately incorporated companies, Crawford Fitting Company, Nupro Company, Whitey Company and Cajon Company. Fred A. Lennon, his wife and daughter were also the only shareholders of four regional warehouses. One of the warehouses owned 80 percent of Constance. The remaining 20 percent of Constance was owned by the assistant secretary of Crawford Fitting, Crawford Fitting's in-house counsel, executive vice president and Crawford Fitting's outside counsel. The court determined there was a transfer of risk because the insured corporation, Crawford Fitting Company, was not the parent of the insurance company, Constance.

More recently, in *Clougherty Packing Co. v. Commissioner,* 84 T.C. ——, P.H. T.C. ¶ 85.61 (1985), the Tax Court, *en banc,* held to the extent a parent corporation reinsured with a wholly-owned subsidiary there was no transfer of risk of loss. Clougherty insured with an unrelated insurance company, which reinsured 92 percent of the risk with the wholly-owned captive insurance company of Clougherty's wholly-owned subsidiary and ceded 92 percent of the premiums to the captive. The majority determined whether the risk of loss was transferred on the basis of *Carnation Co. v. Commissioner,* 640 F.2d 1010 (9th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381. The court stated:

> The financial viability of the captive insurance subsidiary is not controlling. The test continues to be whether, considering all of the facts, the risk of loss was shifted away from the taxpayer who seeks to deduct insurance premiums.

84 T.C. at ——, 85.61 P.H.T.C. at 500–84. The majority explicitly refused to base its decision on the economic unit argument, stating that there was no such testimony before it in the case. The court added, it was reluctant to base its decision on this theory because "it might foster a theory which would be extended to other areas of tax law." *Clougherty, supra,* at ——, 85.-61 P.H.T.C. at 84–501.

It is on this issue that the seven judge dissent focused. The dissent argued that the majority accepted the economic family argument in substance, if not in name. The dissent maintained *Carnation, supra,* was decided on the basis of the interrelationship of the insurance and capitalization agreements. It was these agreements which prevented the transfer of the risk of loss. In *Clougherty,* the dissent maintained, the risk of loss was transferred. The dissent argued, to hold to the contrary disregards the doctrine of separate legal entities.

■ Insurance premiums are deductible as necessary and ordinary business expenses. 26 C.F.R. § 1.162–1 (1985). Sums set aside as reserve payments are not deductible. *See Steere Tank Lines, Inc. v. United States,* 577 F.2d 279, 280 (5th Cir., 1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 634 (1979); *Spring Canyon Coal v. Commissioner,* 43 F.2d 78 (10th Cir., 1930), *cert. denied,* 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555 (1931).

Prior to 1961 Mobil was largely self-insured. Insurance through an insurance affiliate was viewed as an extension of Mobil's self-insurance policy. Although use of a wholly-owned insurance affiliate served legitimate business purposes, Mobil, in substance, by deducting the premiums on its tax returns, achieved indirectly that which it could not do directly.

■ It is well settled that tax consequences must turn upon the economic substance of a transaction and not upon the sequence or form of the transaction. *Waterman Steamship Corp. v. Commissioner,* 430 F.2d 1185 (5th Cir.1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); *Barnett v. Commissioner,* 364 F.2d 742 (2d Cir.1966) *cert. denied,* 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967); *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). "It is too obvious for discussion that generally a taxpayer cannot be al-

lowed to do indirectly through a wholly-owned subsidiary that which it is prohibited from doing directly. Thence by merely qualifying a subsidiary as an insurance company a parent cannot deduct sums equivalent to insurance premiums which it pays to its subsidiary. And the same tax analysis must apply where the premiums are paid indirectly to the subsidiary as reinsurance." *Clougherty, supra,* 84 T.C. at ——, 85.61 P.H.T.C. at 502–84. Mobil, in reality, did not shift the risk of loss. Any losses suffered by the insurance affiliate would be reflected on Mobil's financial statements. Conversely, any profits realized by the affiliates benefited Mobil. This is illustrated by the fact that the profits from GOIC and Bluefield were invested in and were used to establish a credit line for other Mobil affiliates. *See, supra,* at ——, 85.61 P.H.T.C. pp. 7–8.

Mobil argues the government's position conflicts with the legal doctrine of separate corporate entities. *See National Carbide Corp. v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949). *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). Mobil must prove, by the preponderance of the evidence, that the IRS's deficiency determination is incorrect. *Tucker v. United States,* 8 Cl.Ct. 180, 186 (1985); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Carson v. United States,* 560 F.2d 693, 695–66 (5th Cir.1977). In support of its position, Mobil points to other instances in which courts recognized and allowed corporations to shift the risk to an affiliate. This court must agree with the Tax Court when it states "Shifting of risk in transactions other than insurance are simply not relevant here. We are concerned only with the deductibility of insurance premiums." *Clougherty, supra,* 84 T.C. at ——, 85.61 P.H.T.C. at 500–84.

Disallowing insurance premiums paid to captive insurance companies does not totally disregard the separate nature of corporate entities. Rather, it is an example of reclassification of a transaction. As the Tax Court recently stated:

There are numerous situations in the tax law, both statutory and case law, where the separate nature of the entity is not disregarded but the transaction, as cast between the related parties, is reclassified to represent something else, e.g., contributions to capital, loans or dividends, deposits or payments, or other re-characterization such as permitted under section 482, Internal Revenue Code of 1954, as amended. We have done nothing more in *Carnation* and here but to reclassify, as nondeductible, portions of the payments which the taxpayers deducted as insurance premiums but which were received by the taxpayer's captive insurance subsidiaries.

*Clougherty, supra,* at ——, 85.61 P.H.T.C. at 502–84.

In analyzing this issue, the Ninth Circuit also focused on the substance of the transaction and rejected plaintiff's argument that the fact that the insured and the insurer were separate entities was sufficient to achieve risk transference. The court stated:

The focus of our inquiry, as in any incidence of taxation, is the substance of the transaction. *Commissioner of Internal Revenue v. Court Holding Company,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). Petitioner's argument, that the existence of insurance depends on the status of the actors, sidesteps this issue. The separate corporate status of Three Flowers and Carnation has no bearing on whether Carnation shifted the risk to American Home or whether American Home shifted the risk to Three Flowers.

*Carnation Co. v. Commissioner,* 640 F.2d 1010, 1013 (9th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381.

Insurance through a wholly-owned insurance affiliate is essentially the same as setting up reserve accounts. The risk of loss remains with the parent and is reflected on the balance sheet and income statements of the parent. Two district

courts have expressly accepted this theory. *See Beech Aircraft Corp. v. United States, supra; Stearns-Roger Corp., Inc. v. United States, supra.* In addition, the Tax Court has held that there is no risk transference and thus no insurance when a wholly-owned affiliate reinsured the risks of the parent. *See Clougherty, supra.* In the present situation, there was no transfer of the risk of loss. Therefore, premiums paid to or ceded to Mobil's wholly-owned insurance affiliates are not deductible as ordinary and necessary business expenses.

### Constructive Dividends

■ The IRS included certain premiums in the income of the Mobil affiliate group as constructive dividends. Defendant maintains the portion of the premium payments not used to satisfy claims are constructive dividends because the payments were for the primary benefit of Mobil. Plaintiff maintains the premiums were not constructive dividends.

"Although constructive distributions ordinarily involve a receipt of money or property by the shareholder himself, non-arms length transactions (*e.g.,* sales, loans, leases, services) between commonly controlled corporations on occasion have resulted in constructive dividend fallout to the controlling shareholders." B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders,* ¶ 7.05 at 7–29 (4th ed. 1979). The standard to determine whether a transaction constitutes a constructive dividend is set forth in *Sammons v. Commissioner,* 472 F.2d 449 (5th Cir. 1972):

> In every case, the transfer must be measured by an objective test [the distribution test]: did the transfer cause funds or other property to leave the control of the transferor corporation and did it allow the stockholder to exercise control over such funds or property either directly or indirectly through some instrumentality other than the transferor corporation. If this first assay is satisfied by a transfer or funds from one corporation to another rather than by a transfer to

the controlling shareholder, a second, subjective test of purpose must also be satisfied before dividend characterization results. Though a search for intent or purpose is not ordinarily prerequisite to discovery of a dividend, such a subjective test must necessarily be utilized to differentiate between the normal business transactions of related corporations and those transactions designed primarily to benefit the stockowner.

472 F.2d at 451.

"In determining whether the primary purpose test has been met, we must determine not only whether a subjective intent to primarily benefit the shareholders exists, but also whether an actual primary economic benefit exists for the shareholders. *Kuper v. Commissioner,* 533 F.2d 152, 160 (5th Cir.1976)." *Stinnett's Pontiac Service, Inc. v. Commissioner,* 730 F.2d 634, 641 (11th Cir.1984). The record does not establish that the insurance payments were made for the primary economic benefit of Mobil. Mobil Overseas organized the insurance companies to serve a legitimate business purpose. The primary purpose for the insurance payments in issue was to provide Mobil affiliates with sufficient protection for their covered risks. Defendant's position ignores the fact that the affiliates received protection for their assets in exchange for the payments made. The premiums do not constitute constructive dividends as opposed to normal business transactions.

### Conclusion and Order

For the foregoing reasons, it is concluded that plaintiff is not entitled to recover a refund(s) for disallowed deductions of the portion of the insurance premiums paid or ceded to Mobil insurance affiliates. It is also concluded that plaintiff is entitled to recover a refund(s) of additional taxes paid for the adjustment of insurance premium payments to income as constructive dividends. A final judgment can be entered on these claims under Rule 54(b) once quantum is determined. It is thus ORDERED that counsel shall promptly confer and, on

or before August 30, 1985, file a Status Report(s) with the clerk of the court indicating what procedures are now deemed appropriate to obtain a resolution of the quantum amounts required for the entry of judgment in an inexpensive and expeditious manner.