OCEAN DRILLING & EXPLORATION COMPANY, (on behalf of itself and its consolidated subsidiaries), Plaintiff–Appellee,

v.

The UNITED STATES, Defendant–Appellant.

No. 92–5127.

United States Court of Appeals, Federal Circuit.

March 9, 1993.

James E. Milliman, Middleton & Reutlinger, Louisville, KY, argued, for plaintiff-appellee. With him on the brief were Charles J. Lavelle and Margaret E. Keane, Greenebaum, Doll & McDonald.

David I. Pincus, Dept. of Justice, Washington, DC, argued, for defendant-appellant. With him on the brief were James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen and John A. Dudeck, Jr., Attys.

Before NIES, Chief Judge, ARCHER and CLEVENGER, Circuit Judges.

PER CURIAM.

The United States appeals the judgment of the United States Claims Court[1] in *Ocean Drilling & Exploration Co. v. United States*, 24 Cl.Ct. 714 (1991). The issues appealed by the government are: (1) whether the Claims Court erred in holding that payments made by Ocean Drilling & Exploration Company (ODECO) (on behalf of its operating subsidiaries) to Mentor Insurance Limited (Mentor), a wholly-owned subsidiary of ODECO, constituted true insurance premiums that are deductible as business expenses under section 162 of the Internal Revenue Code of 1954, as amended (IRC),[2] and (2) if properly classified as insurance premiums, whether Mentor's income from insuring the drilling rigs of ODECO's subsidiaries located in waters of the outer continental shelf of the United States constituted income from the insurance of United States risks within the meaning of sections 951–953 of the IRC.

We adopt the analysis and holding on these issues as set forth in the Claims Court's opinion, which is attached as an appendix. Accordingly, the judgment of the Claims Court is

AFFIRMED.

## APPENDIX

### OPINION OF THE UNITED STATES CLAIMS COURT

### OPINION

NETTESHEIM, Judge.

This tax refund case, before the court after trial, calls for resolution of two ques-

---

1. The Claims Court was renamed the Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506.

2. All references are to the Internal Revenue Code of 1954, as amended, because the tax years involved in this proceeding are 1974 and 1975. *See* 26 U.S.C. §§ 162, 951–953 (1988).

tions: first, whether payments by a parent company to its wholly-owned Bermuda insurer during tax years 1974 and 1975 constitute a reserve for losses as opposed to insurance premiums that qualify as a business deduction for federal income tax purposes; second, if the payments constitute insurance, whether the premiums were for insurance of property located in the United States and therefore taxable income.

## FACTS

The following facts were developed at trial. Plaintiff Ocean Drilling and Exploration Company ("ODECO" or "plaintiff") was incorporated in 1953 to take advantage of business opportunities that resulted from the opening up of the Gulf of Mexico to oil and gas exploration.[1] Murphy Oil Corporation ("Murphy") and private investors provided the funds to establish plaintiff. The objectives of plaintiff were to build offshore drilling rigs and to invest the profits earned from this undertaking to establish an oil and gas reserve base. Plaintiff achieved these objectives and during the years at issue in this case, 1974 and 1975, operated as a holding company, with subsidiaries conducting its business. Plaintiff's principal lines of business during that period were offshore contract drilling, exploration for and production of oil and gas, underwater diving services, and insurance.

Richard E. Roberson, Jr., testified as to the development and business operations of plaintiff and its insurance subsidiary, Mentor Insurance Limited ("Mentor"). Mr. Roberson's knowledge derives from his experience as an internal auditor at Murphy from 1962 to 1965; controller for plaintiff from 1965 to 1977; vice-president for plaintiff from 1974 to 1977; and controller for Mentor from 1968 through the years at issue in this case. Currently, Mr. Roberson is employed by plaintiff as vice-president of finance. He returned to ODECO in

1986 after serving in executive positions with two other oil companies between 1977 and 1983 and as a financial consultant between 1983 and 1986.

Mr. Roberson described at length the type of drilling rigs owned by plaintiff and its subsidiaries and insured by Mentor. Plaintiff designed the first rig capable of operating as a mobile drilling rig in the Gulf of Mexico.[2] Prior to the advent of mobile rigs, exploration companies had to construct artificial islands, also known as platforms, and use conventional land rigs on these sites. If oil was not discovered, the platform had to be torn down. Mobile drilling rigs reduced the cost of exploration; they could be moved from one location to another, thereby avoiding the cost of constructing and tearing down platforms. The mobile drilling rigs at issue in this case were operating in the Outer Continental Shelf area of the Gulf of Mexico.

During the 1960's plaintiff faced difficulties insuring its drilling rigs. At that time the drilling rig business was written predominately by the Lloyd Syndicate ("Lloyd's"), with the London Market serving as an ancillary market to Lloyd's. As the technology of drilling rigs developed rapidly, Lloyd's adjusted its insurance rates in an attempt to cover itself against potential losses from the new drilling rigs. Because of the limited experience in insuring the new rigs and a number of substantial losses on these rigs, insurance rates increased sharply. By the end of the 1960's, rates were as high as 10 percent of the value of insured vessels, and plaintiff was unable to obtain full coverage of its rigs through the existing insurance market. In response to this dilemma, plaintiff analyzed its history of premiums and losses and determined that establishment of a captive insurer could alleviate the problems that plaintiff faced in the insurance market. In 1968 plaintiff established Mentor as a wholly-owned subsidiary incorporated in Bermuda.

1. ODECO brought this suit on behalf of itself and its subsidiaries with which it filed consolidated federal income tax returns in 1974 and 1975. Plaintiff in this decision refers only to ODECO.

2. Previously there had been limited use of a mobile drilling rig in the bays and lakes of south Louisiana.

The initial capitalization for Mentor was $12,000.00, the minimum amount of capitalization required to organize a company in Bermuda. Plaintiff increased the capital contribution to Mentor to $200,000.00 by the end of 1968. In a December 19, 1968 meeting of Mentor's board of directors, the chairman of the board stated that this increase in capital was necessary for the insurance business that Mentor was undertaking. In June 1969 plaintiff increased Mentor's capitalization to $950,000.00. At the time Mentor was increasing its insurance of plaintiff's risks and considering insuring the risks of companies unrelated to plaintiff. Mentor increased its capitalization because of its concern that it be adequately capitalized and able to attract unrelated entities to insure with Mentor.

The capitalization of Mentor remained at $950,000.00 through the years 1974 and 1975, despite Mentor's purchase of another insurance company in 1975.[3] Through 1975 Mentor was never asked by the Government of Bermuda to increase its capital, nor was it informed that it did not meet the capital requirements of Bermuda. For 1974 the capital surplus (share capital + retained earnings + minority interests) of Mentor amounted to $12,508,417.00; the net earned premiums (accounted for premiums net of commissions and reinsurance) were $5,335,617.00; the losses paid were $2,527,640.00; and the reserves for losses (liabilities) were $2,512,030.00. For 1975 the capital surplus was $15,943,790.00; the net earned premiums were $12,310,711.00; the losses paid were $7,946,191.00; and the reserves for losses were $6,427,834.00. Mentor's capitalization during 1974 and 1975 was adequate to cover any losses that might be presented to Mentor for payment.[4]

Mentor maintained offices in Bermuda from the time of its inception in 1968. Initially, Mentor shared an office and employees with Universal Marine Insurance Co., Ltd. ("Universal Marine"), a company not affiliated with plaintiff. This share arrangement between Mentor and Universal Marine was a common practice among insurers in Bermuda. Mentor entered into the arrangement prior to underwriting any insurance and concluded the arrangement in 1973 due to the increased business of both companies.

When the arrangement between Mentor and Universal Marine was instituted, Mentor's books were transferred to Bermuda. A chartered accountant kept Mentor's books, and Anthony Robert Gwinnell, an employee of both Mentor and Universal Marine in Bermuda, underwrote insurance for Mentor.[5] Mr. Gwinnell was employed by Mentor and Universal Marine from December 1968 to February 1971. His position with Mentor required that Mr. Gwinnell establish an underwriting seat for Mentor in Bermuda. He was also responsible for the placement of investments for Mentor, but plaintiff determined how funds

---

**3.** Mentor purchased Enterprise Insurance ("Enterprise") on January 1, 1975, for $1,375,000.00 and thereby assumed the insurance obligations of Enterprise. Prior to acquiring Enterprise, Mentor acted as an agent for Enterprise. Its activities as agent entailed underwriting risks for Enterprise and then ceding the risks to Enterprise by way of reinsurance. Enterprise had been a subsidiary of Murphy, a 51.8–percent owner of plaintiff, but had not underwritten risk for Murphy. Thus, the purchase of Enterprise by Mentor did not increase the amount of related business Mentor was insuring.

**4.** Francis James Carter, the underwriter for Mentor during 1974 and 1975, testified that the capitalization of Mentor was sufficient to cover potential losses of insured companies. He stated that it was normal in the insurance business

for net earned premiums to be as much as two and one-half times greater than the amount of capital surplus and that Mentor's ratio of net earned premiums to capital surplus of less than one to one was very conservative. Mr. Carter concluded that Mentor's conservative ratio, combined with the fact that Mentor's capital surplus was considerably greater than its reserve losses, indicated that Mentor was sufficiently capitalized to pay off any claims. The court concurs with the assessment of Mr. Carter that Mentor was adequately capitalized in 1974 and 1975.

**5.** The deposition of Mr. Gwinnell, now deceased, was taken on August 1, 1978, in a previous action between the parties. Designated portions of Mr. Gwinnell's deposition were admitted into evidence.

would be invested during Mr. Gwinnell's tenure with Mentor.

When plaintiff hired Mr. Gwinnell, plaintiff explained to him that Mentor initially would insure risks of plaintiff and that, if such endeavor proved successful, Mentor would begin underwriting risks for unrelated parties. Consequently, the first policies Mr. Gwinnell wrote for Mentor were those of plaintiff, followed by those of unrelated parties from 1970 onward. The reinsurance of Mentor's policies began in 1969 as a measure to protect the policies written by Mentor.

In his position with Mentor, Mr. Gwinnell rejected submissions for insurance that he deemed undesirable or bad for business. The rates charged by Mentor to plaintiff and third parties were not established or approved by plaintiff. Plaintiff negotiated through its brokerage house, Marsh & McLennan Inc. ("Marsh & McLennan"), the rates it would pay for insurance by Mentor. Plaintiff paid Marsh & McLennan for insurance obtained for itself and its subsidiaries with Mentor and other insurers. Marsh & McLennan then paid the insurers directly, and plaintiff charged its subsidiaries for their share of the insurance.

Subsequent to the conclusion of the arrangement with Universal Marine, Mentor retained its own accountant and underwriter in Bermuda. Mentor compensated them with funds from accounts in Bermuda. Mentor also retained both legal counsel, Conyers, Dill & Pearman, and a certified public accounting firm, Peat, Marwick, Mitchell & Co., in Bermuda. Operations conducted in Bermuda by Mentor included hiring, firing, budgeting, underwriting, and expanding business. To execute these practices, Mentor had five to six employees in Bermuda during 1974 and 1975.

The underwriter for Mentor during 1974 and 1975 was Francis James Carter. Mr. Carter, an impressive and informative witness, testified as to the operations of Mentor during his tenure in Bermuda. Mr. Carter started working for both Mentor and Universal Marine in 1971 after working for Lloyd's for eleven years. In 1971 Mentor had a capital surplus of greater than $2 million, and Mr. Carter was expected to underwrite a general account for Mentor. When the arrangement between the two insurance companies ended in 1973, Mr. Carter worked exclusively for Mentor until 1978. In 1974 Mr. Carter was promoted to vice-president and director of Mentor. In this position he was responsible for the entire running of the office, including underwriting, budgeting, expanding business, hiring and firing of employees, and generally managing Mentor.

Mr. Carter knew of no Mentor funds loaned to or commingled with funds of plaintiff or its subsidiaries. Mentor refrained from undertaking such transactions because the resulting arrangements would have reflected negatively on Mentor's financial stability. From 1973 until the time Mr. Carter left Mentor, the investment decisions of Mentor were under the control of Mentor's accountant, Collin O'Conner, who worked with plaintiff's treasury department on investment decisions. Investment guidelines were established by Mentor's board of directors in accordance with plaintiff's investment criteria.

Premiums paid to Mentor for insurance coverage were placed in Mentor's accounts. Mentor maintained a premium loss account of approximately $2–$3 million in Bermuda during 1974 and 1975 to cover operating expenses and policyholders' claims. Funds in excess of this amount were maintained in accounts outside Bermuda. Investment of Bermuda funds consisted primarily of high grade certificates of deposit. Plaintiff's treasury department, or, specifically, Odie Vaughan, managed the investment of Mentor's other funds within the guidelines established by Mentor's board of directors. Mr. Vaughan was treasurer of both plaintiff and Mentor.[6]

---

**6.** Defendant in its post-trial brief stated that Mentor's "main" bank account was located in the Whitney National Bank, New Orleans, Louisiana. This was not established at trial. Mr. Vaughan "thought" that premiums were received by Mentor at the Whitney account in New Orleans, which he believed to be the main account. However, Mr. Carter definitively testified that Mentor collected premiums in Bermuda. Because it was established at trial that

Mentor's funds were separate from plaintiff's funds through 1975; Mentor never loaned money to plaintiff or its subsidiaries;[7] Mentor's funds were never used as collateral for plaintiff's loans; Mentor never invested in any of plaintiff's non-insurance subsidiaries; and Mentor's investment funds were not commingled with plaintiff's investment funds. The only guarantee by plaintiff of amounts payable under a Mentor policy of insurance was for a policy issued to Ben ODECO Limited ("Ben ODECO") in 1977.[8] However, for both tax years 1974 and 1975, plaintiff included the revenue and income of Mentor on its Consolidated Statements of Income and included Mentor as an asset on its Consolidated Balance Sheets.

Mentor's business was not completely separate from plaintiff's business.[9] Mentor was required to obtain approval from plaintiff's board of directors for certain facets of its business, including approval of its operating budget, approval of letters of credit over a certain amount, approval of large claims, and approval of capital expenditures.[10] Furthermore, Mentor had directors and officers who were employees of plaintiff and its affiliates. In 1974 four of Mentor's seven officers were employees of plaintiff or its affiliates, and in 1975 four of Mentor's eight officers were employees of plaintiff. The treasurer for both plaintiff and Mentor, Mr. Vaughan, is an example of an individual with loyalties to both plaintiff and Mentor.

Mr. Vaughan testified as to his responsibilities as treasurer for both plaintiff and Mentor during 1974 and 1975. Although he acted as treasurer for both entities, Mr.

Mentor's funds were not commingled with plaintiff's funds, the court does not deem essential to its decision the determination of the location of either the collection of premiums or the main account of Mentor.

7. Defendant's assertion in its post-trial brief that Mentor loaned money to plaintiff is unfounded. The evidence that defendant offers as proof of its assertion does not indicate that Mentor loaned money to plaintiff. Plaintiff's accounts receivable noted that Mentor Insurance Company (U.K.) Limited, owned 70 percent by Mentor and 30 percent by plaintiff, owed plaintiff $34,095.05 at the start of both 1975 and 1976 and that plaintiff owed Mentor approximately $36,000.00 at the beginning of 1976. The accounts receivable documents did not specify the items represented by these amounts. This is not proof that Mentor loaned funds to plaintiff. The court finds credible the testimony of Messrs. Roberson, Carter, and Vaughan that Mentor to their knowledge did not loan money to plaintiff. Because the court believes these principal employees of Mentor and plaintiff would have known if Mentor had loaned funds to plaintiff, the court finds that no loans were made to plaintiff by Mentor.

8. Ben ODECO was a joint venture between ODECO and Ben Line Streamers. Ben ODECO owned and operated drilling barges and purchased insurance through Ben Line Streamers and through ODECO via Marsh & McLennan. Mentor's arrangement with Marsh & McLennan resulted in Mentor's insuring a small portion of the risk of Ben ODECO.

9. Defendant in its post-trial brief stated that Mentor was required to insure risks of North American Reinsurance Company ("North American") as part of an agreement between plaintiff and North American. This fact was not established at trial. Mr. Carter testified that Mentor's business relationship with North American was one of reciprocity or goodwill trading and that he believed this business represented only two out of hundreds of treaties written by Mentor. Such evidence is not sufficient to validate defendant's implication that plaintiff determined what business Mentor would write. In actuality, this implication was specifically negated at trial by the testimony of Mr. Carter that he determined whether to underwrite the risks of North American.

10. Mentor's submission of its budget to plaintiff's board of directors for approval was a part of an aggregate budget submitted by plaintiff and its subsidiaries to the board for approval. In addition to the budget process, plaintiff had an authorization for expenditure ("AFE") process that applied primarily to its contract drilling and oil and gas operations. Under this process expenditures, depending on the amount, had to be approved by a manager, the president, or the board. Thus, when Mentor paid off on a claim, the subsidiaries of plaintiff insured by Mentor had to go through the AFE process before spending the money received from Mentor.

With respect to the payment of large claims, plaintiff's approval was required only in instances where Mentor had approved a payment that could severely drain the premium loss account. If Mentor did not approve payment of a claim, Mentor's decision was not subject to review by plaintiff.

Vaughan was considered an employee of plaintiff. The work performed for Mentor was done under a fee arrangement. Mr. Vaughan was responsible for the administrative functions with respect to the receipt, disbursement, and investment of money of both plaintiff and Mentor. Mr. Vaughan knew of no Mentor funds commingled with plaintiff's funds, loaned to plaintiff, or used as collateral for plaintiff's loans. When plaintiff owed a subsidiary money or a subsidiary owed plaintiff money, a check would be issued for the amount owed, rather than merely noting the transfer of funds in their books.

Charles Niederer[11] was a second individual affiliated with both plaintiff and Mentor. Prior to August 1974, Mr. Niederer occupied the position of insurance manager for Murphy. This position entailed the purchasing of insurance and the general management of insurance operations for Murphy. Mr. Niederer held a similar position with plaintiff from August 1974 until January 1977, when he became vice-president of insurance for plaintiff. Mr. Niederer's positions with Mentor included vice-president of Mentor from May 1969 to April 1974 and director and chairman of the board of directors of Mentor from April 1974 through the years at issue. As chairman of the board, Mr. Niederer received reports from Mr. Carter on the underwriting business transacted by Mr. Carter. While Mr. Carter actually determined what business to underwrite within the guidelines established by the board, Mr. Niederer maintained an active role overseeing such business. His active role stemmed from his ardent interest in Mentor's business and from his personal relationship with some of the parties acquiring insurance from Mentor.[12]

The rates charged by Mentor to plaintiff were based on the commercial rates in London. In 1974 and 1975, the rates Mentor charged to plaintiff were the London rates modified to reflect plaintiff's experience. Mentor's typical policy for plaintiff was a joint policy with an unrelated insurer that would underwrite 5 to 20 percent of the risk of plaintiff. In addition to co-insuring plaintiff's policies, Mentor reinsured a portion of plaintiff's risk. During 1974 and 1975, Mr. Carter determined what risk Mentor would accept within the guidelines established by Mentor's board of directors. Mr. Carter could decline to insure the risks of plaintiff. When a claim for loss was submitted to Mentor by plaintiff, Mentor appointed an experienced surveyor to verify the validity of the claim. This same procedure of verification was used by Mentor for claims by unrelated parties that Mentor reinsured as a lead underwriter.

Mentor's business entailed writing direct insurance for plaintiff and writing reinsurance for unrelated companies. Mentor's insurance of risks of plaintiff's subsidiaries consisted of two types of policies. One type of policy covered the full value of the property insured for plaintiff. The second type of policy was a first-loss policy that covered the first $1 million of a loss. Plaintiff purchased first-loss policy insurance for property that it had insured with Oil Insurance Limited ("OIL") and for which there existed a $1 million deductible per occurrence.[13] Thus, if there was an event that caused damage to one or more ships, Mentor would be liable for the first $1 million of loss and OIL would be liable for the balance of the loss.

With respect to business of Mentor unrelated to plaintiff for the years 1974 and 1975, respectively, the net premiums received from Highlands Insurance Company ("Highlands") accounted for 57 percent and

---

11. Mr. Niederer is now deceased.

12. Defendant stated in its post-trial brief that Mr. Niederer had final authority to determine which policies to accept. Evidence to support this contention was not forthcoming at trial. The testimony of Messrs. Roberson and Carter established that Mr. Carter made the underwriting decisions for Mentor and that Mr. Niederer's role merely was one of oversight.

13. OIL, a Bermuda insurance company, was created by several major oil corporations. Plaintiff joined OIL in 1971 through plaintiff's parent company Murphy.

56 percent of all net premiums received from unrelated business.[14] Mentor's ratios of incurred claims to net premiums for Highlands during 1974 and 1975 were 138.4 percent and 112.4 percent, respectively, indicating that incurred claims exceeded net premiums. The corresponding ratios for all unrelated business of Mentor were 123.4 percent and 101 percent, while those ratios for business of plaintiff were 15.1 percent for 1974 and 13.9 percent for 1975, indicating that plaintiff's net premiums exceeded its incurred claims. These underwriting statistics do not reveal whether Mentor ultimately suffered a loss from its unrelated business during 1974 and 1975, since they do not take into account money earned from investment of premiums.[15]

The Internal Revenue Service (the "IRS") in its audit of plaintiff for tax years 1974 and 1975 determined that premiums received by Mentor from plaintiff and its consolidated United States subsidiaries amounted to self insurance. The IRS proposed for disallowance as a business expense the amount of $1,433,214.00 for 1974 and $1,744,194.00 for 1975. In addition, the IRS developed an alternative position in the event that the premiums were allowed as a deduction. The IRS determined that premiums earned from drilling rigs operating over the Outer Continental Shelf of the Gulf of Mexico were premiums on property located in the United States. The IRS determined that such premiums not already included as income by plaintiff amounted to $1,333,617.00 for 1974 and to $1,257,876.00 for 1975. The IRS proposed that these amounts be included as income under Internal Revenue Code, 26 U.S.C. ("I.R.C.") § 953 (1970), a provision requiring taxpayers to include as income premiums earned from insurance of United States risks.

Edward K. Dwyer testified as to the derivation and accuracy of the IRS's figures. Mr. Dwyer was employed by plaintiff from July 1973 to July 1984, initially as tax manager and subsequently as tax director. Mr. Dwyer was responsible for tax planning, complying with tax laws, handling IRS audits, working with outside and in-house tax counsel, and filing of federal income tax returns for plaintiff and its subsidiaries. Mr. Dwyer was involved in, and had the responsibility for, IRS audits of the tax returns of plaintiff and its subsidiaries for tax years 1969–1975. The tax returns were compiled from the workpapers of outside auditors, from the workpapers of earlier years, and from supplemental material obtained from plaintiff and its subsidiaries. In auditing plaintiff and its subsidiaries, the IRS examined the workpapers used to prepare the tax returns and scrutinized thoroughly inter-company dealings. Mr. Dwyer reviewed the assessments made by the IRS for tax years 1974 and 1975 and determined that the amounts assessed for disallowance of a business expense and for premiums earned on property located in the United States were complete and accurate representations of what the IRS purported them to be—that is, he agreed that the amounts assessed for disallowance were the premiums received by Mentor from plaintiff and its consolidated United States subsidiaries and that the amounts assessed for premiums earned on

14. When William Nolan, a senior vice-president of Highlands, wrote to Mentor to request letters of credit, he addressed the correspondence to Mr. Niederer, who was responsible for acquiring insurance for plaintiff, not to Mr. Carter, who was vice-president of Mentor at the time. Mr. Carter testified that this was due to Mr. Nolan's incompetence and offered as further proof of such incompetence the fact that Mr. Nolan had incorrectly stated Mentor's name. (Mr. Nolan wrote "MENTOR INSURANCE COMPANY" rather than Mentor Insurance Limited.) Mr. Carter admitted that Mentor needed to obtain the approval of plaintiff to issue letters of credit over a certain amount. Defendant in its post-trial brief asserted that Mr. Nolan was correct in writing to Mr. Niederer, since Mr. Niederer had the authority to approve Mentor's providing the requested letters of credit. The only point the court finds relevant with respect to this matter is that letters of credit for large amounts could not be issued by Mentor without plaintiff's approval.

15. Defendant, in its post-trial brief, concluded that this evidence indicated that the earned surplus of Mentor for 1974 and 1975 was derived solely from premiums paid by plaintiff. The term "earned surplus" was not defined at trial or in defendant's post-trial brief.

United States risks were the premiums earned from drilling rigs operating over the Outer Continental Shelf of the Gulf of Mexico that had not been included as income by plaintiff.[16]

## DISCUSSION

### I. *Risk shifting and risk distributing*

The first issue to be addressed is whether payments by plaintiff to its subsidiary insurer constitute insurance, thus qualifying as a business deduction for federal income tax purposes.

I.R.C. § 162(a) allows as a deduction from taxable income "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Insurance premiums are considered an ordinary and necessary business expense. Treas.Reg. § 1.162–1(a) (1973). Over the last ten years, several courts have addressed the issue of whether premiums paid by a parent company to a subsidiary insurer constitute insurance. These courts based their findings on this issue on the Supreme Court's definition of insurance in *Helvering v. Le Gierse*, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941). In *Le Gierse* the Supreme Court stated that "insurance involves risk-shifting and risk-distributing...." 312 U.S. at 539, 61 S.Ct. at 649. The Court in *Le Gierse* did not provide definitions for risk-shifting and risk-distributing, and consequently lower courts differ on their interpretations of these terms.

■ 1. Courts also have differed on the significance of treating the parent company and the subsidiary insurer as separate entities on the question of whether payments to a subsidiary insurer constitute insurance. Under *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438–39, 63

S.Ct. 1132, 1133–34, 87 L.Ed. 1499 (1943), a corporation with a legitimate business purpose must be treated as "a separate taxable entity." Thus, *Moline Properties* stands for the proposition that a parent corporation and its subsidiary corporation be accorded treatment as separate taxable entities. *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949). The courts disagree on the role of this requirement in determining whether payments to a subsidiary insurer constitute a valid business deduction for the parent corporation.

The focus in the case at bar differs from that of some of the earlier cases involving a parent company and its subsidiary insurer. The primary issue in this case involves the effect of business unrelated to the parent that a subsidiary insurer underwrites in determining whether a parent's payments to its subsidiary constitute insurance. The following discussion of prior case law indicates that this issue was not a central focus of any court's decision until earlier this year. However, analysis of the prior case law is helpful in understanding the development of a definition for what is meant by "insurance" in tax law. The cases discussed below are not binding precedent on the Claims Court.

*Carnation Co. v. Commissioner*, 640 F.2d 1010 (9th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981), involved a subsidiary insurance company, incorporated in Bermuda, and wholly-owned by its parent. The subsidiary wrote insurance solely for the parent company and its subsidiaries. The parent company, Carnation Company, purchased insurance from an unrelated insurer and the subsidiary insurer then reinsured the unrelated insurer for 90 percent of Carnation's liability. As part of the agreement with the unrelated insurer, the parent company

---

16. Mr. Dwyer did not comment on the legal contentions of the IRS that such amounts were income. Rather, he verified the accuracy of the derivation of the numbers.

In addition, Mr. Dwyer testified that the tax returns for 1974 and 1975 were completed in accordance with the "70/30 Rule" [sic] that appears in the Treasury Regulations for I.R.C.

§ 953. The rule provides that if an asset is in the United States for not more than 30 percent of the days of a period, such asset shall not be considered to be located in the United States and that if an asset is in the United States for more than 50 percent of the days of a period, such asset shall be considered to be located in the United States. Treas.Reg. § 1.953–2 (1964).

agreed to capitalize the subsidiary insurer for up to $3,000,000.00 at either the subsidiary's request or the parent's election.[17]

In assessing whether risk shifting and risk distribution took place, the Ninth Circuit looked to "the substance of the transaction." 640 F.2d at 1013. The court analyzed the insurance, reinsurance, and capitalization agreements together and determined that the agreements operated to neutralize risk in the instances of reinsurance by the subsidiary insurer. In addition, the court noted that Rev.Rul. 77–316, 1977–2 C.B. 53, situation 2, stated on facts identical to those before the court that "there ... [was] no risk shifting or risk distribution with respect to the risks carried or retained by the wholly owned subsidiary...." *Carnation*, 640 F.2d at 1013.[18] The court did not attempt to define "insurance" except to say that it involves risk shifting and risk distribution. Without discussing how risk is shifted or distributed, the court concluded that the agreements neutralized risk to the extent of reinsurance and that the separate corporate status of the subsidiary and parent had no bearing on whether the risk was shifted away from the parent.

*Stearns–Roger Corp. v. United States*, 774 F.2d 414 (10th Cir.1985), involved an insurance company, incorporated under state captive insurance laws. Under these laws the captive insurer could insure only risks of the parent company, its subsidiaries, its affiliates, and associated companies. The parent company, Stearns–Roger Corporation, and one of its wholly-owned subsidiaries owned all the stock of the captive insurer. The parent company provided initial and subsequent capital to the captive insurer and indemnified the captive insurer for up to $3,000,000.00 for losses that it might suffer. The captive company insured risks of the parent, the parent's subsidiaries and affiliates, and participants in projects where the parent had assumed such participants' risks. The parent company paid for this coverage by the captive company.

The Tenth Circuit in *Stearns–Roger* did not attempt to define "insurance" beyond stating that it must involve risk shifting or risk distribution. The court focused on the effects of the parent's payments to the captive insurer to resolve whether the payments amounted to insurance. The court asserted that it did not ignore the separate corporate status of the captive and parent companies and that this status was not inconsistent with its findings. The court determined that the parent company's assets were diminished by any casualty loss and, thus, that the economic reality of the situation was that the risk of loss did not leave the parent company. The parent did not receive insurance for its payments, the court concluded, because the parent did not shift its risk of loss. The court noted that it did not consider the indemnity agreement in its analysis.

*Mobil Oil Corp. v. United States*, 8 Cl. Ct. 555 (1985), involved four insurance companies, owned indirectly by one company, Mobil Oil Corporation ("Mobil"). The loci of incorporation for the affiliate insurers included the Bahamas, Bermuda, and the United Kingdom. The affiliate insurers wrote insurance for the parent, its affiliates, and for unrelated parties.

To determine if insurance existed, the Claims Court in *Mobil* analyzed whether Mobil had sufficiently transferred the risk of loss. The court assessed the economic substance of the transaction and determined that any losses or profits realized by the insurance affiliates would be reflected on Mobil's financial statements. The court concluded that this did not amount to a transfer of risk of loss by Mobil. The court stated that "[i]nsurance through a wholly-owned insurance affiliate is essentially the same as setting up reserve accounts. The risk of loss remains with the parent and is reflected on the balance sheet

---

**17.** The initial capital contribution was $120,000.00.

**18.** The revenue ruling is not applicable to the present case as it specifically deals with situations where the subsidiary insurer writes no unrelated business.

and income statements of the parent...." 8 Cl.Ct. at 567. The court determined that its holding did not disregard the separate status of parent and affiliate insurer, but, rather, was "an example of reclassification of a transaction." *Id.* The court did not address the issue of what impact the writing of unrelated business by the affiliate insurer might have on the determination of whether the payments by Mobil amounted to insurance.

In *Beech Aircraft Corp. v. United States,* 797 F.2d 920 (10th Cir.1986), the insurance company was incorporated in Bermuda and was primarily owned by Beech Aircraft Corporation ("Beech Aircraft") and its affiliates. All but 0.5 percent of the insurer's business was insurance issued Beech Aircraft. The premium paid by Beech Aircraft supplemented by the interest the premium would earn equaled the liability of the insurer to Beech Aircraft. The Tenth Circuit stated that *Stearns–Roger* "bears directly on" and "for all practical purposes, is dispositive of" the case before the court. 797 F.2d at 923. The court in *Beech Aircraft* assessed the economic reality of the transaction and determined that Beech Aircraft paid for any losses sustained by the insurer and that no shifting of risk occurred. The court held that the separate corporate status of Beech Aircraft and the insurer did not prevent a finding that risk of loss did not shift. The court did not discuss any effects of unrelated business.

*Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297 (9th Cir.1987), involved a wholly-owned subsidiary incorporated in Colorado under state captive insurance laws. The parent company, Clougherty Packing Company ("Clougherty"), purchased insurance from an unrelated insurer which then reinsured the first $100,000.00 of each claim against Clougherty with the subsidiary insurer. The subsidiary insurer's only business was reinsurance of the parent company. The Ninth Circuit in *Clougherty* defined "insurance" as involving risk shifting and risk distributing. The court stated that "[i]f the insured has shift-

ed its risk to the insurer, then a loss by or a claim against the insured does not affect it because the loss is offset by the proceeds of an insurance payment...." 811 F.2d at 1300. With respect to risk distributing, the court stated that "[i]nsuring many independent risks in return for numerous premiums serves to distribute risk...." *Id.* The court determined that risk shifting did not take place and, therefore, did not address the issue of risk distributing.

According to the Ninth Circuit, the insurance and reinsurance contracts were interdependent; interdependent agreements must be considered together to determine their economic effect. The court examined the assets of the insured party, not the insurer's assets or "some aggregation of the two," to see if the risk of adverse economic consequences was divested from the insured by the agreements. 811 F.2d at 1305. Because the insurer's "income and net worth f[e]ll dollar for dollar by the amount of the loss" claimed by the parent and because the insurer did no business other than the parent's, the stock of the insurer declined by the amount of the claim. *Id.* The court maintained that, consequently, the assets of the insured fell by the amount of the claim: The insured was the owner of the insurer's assets and the reduction in value of the insured's assets was the same as it would have been if the parent had self-insured. Thus, the court concluded that risk of loss did not shift.

The court stated that its holding did not conflict with *Moline Properties* since only the assets of the insured were analyzed to determine if risk shifted. The Ninth Circuit reiterated its holding in *Carnation,* that Rev.Rul. 77–316 does not conflict with *Moline Properties.* The court pointed out that other courts had addressed the captive insurer issue and none had determined that "a policy provided by a wholly-owned subsidiary that exists solely for the purpose of providing insurance to its parent constitutes insurance, or that such a conclusion violates *Moline Properties.*" 811 F.2d at 1303.

*Humana Inc. v. Commissioner,* 881 F.2d 247 (6th Cir.1989), involved an insur-

ance company incorporated in Colorado under state captive insurance laws. The insurer provided coverage for the parent company and its subsidiaries. The parent company, Humana Incorporated ("Humana"), purchased insurance for itself and its subsidiaries from the captive insurer and then charged its subsidiaries for their share of coverage. Humana owned 75 percent of the insurer, and a wholly-owned subsidiary of Humana owned 25 percent of the insurer.

The Sixth Circuit, relying on *Le Gierse*, stated that an insurance contract involves risk shifting and risk distribution: "Risk shifting involves the shifting of an identifiable risk of the insured to the insurer.... Risk distribution involves shifting to a group of individuals the identified risk of the insured...." 881 F.2d at 251. The court then separately analyzed the premiums paid by the parent and the premiums paid by the subsidiaries. It concluded that the rationale of *Clougherty* and *Carnation* applied to the parent's premiums and, consequently, that these premiums did not constitute insurance. With respect to the premiums paid by the subsidiaries, the court determined that *Moline Properties* required that the separate corporate status of the subsidiaries and the insurer be maintained. Adopting the analysis in *Clougherty*, the Sixth Circuit examined the effect of a claim on the assets of the insured. The court considered the insured to be the subsidiaries and not the parent under *Moline Properties*. When the insurer paid a claim, the assets of the subsidiaries were not affected and, thus, the risk of loss transferred from the insured to the insurer.

The court stated that it did not look to the assets of the parent because to do so would be to treat the parent, its subsidiaries, and the insurer "as one 'economic unit' and ignore the reality of their separate corporate existence for tax purposes in violation of *Moline Properties*." 881 F.2d at 256. The court noted that "absent specific congressional intent to the contrary, ... a court cannot disregard a transaction in the

name of economic reality and substance over form absent a finding of sham or lack of business purpose under the relevant tax statute." *Id.* at 255 (citations omitted).

After determining that risk shifting occurred, the court stated that risk distribution must also be present for insurance to exist. The court concluded that risk distribution was present since several corporations were insured and losses could be spread among them. Thus, the court ruled that the premiums paid by the subsidiaries of Humana constituted insurance because both risk shifting and risk distribution occurred.

*Gulf Oil Corp. v. Commissioner*, 914 F.2d 396 (3d Cir.1990), an appeal from the United States Tax Court, involved a subsidiary insurer incorporated in Bermuda. The insurer was undercapitalized until 1975 when the parent company, Gulf Oil Corporation ("Gulf"), transferred ownership of the insurer to Gulf's wholly-owned holding company, which provided additional capital to the insurer. Gulf and its affiliates paid premiums to third-party commercial carriers. These carriers then reinsured a significant portion of their liability to Gulf and its affiliates with the subsidiary insurer. Gulf executed guarantees to the third-party commercial carriers obligating Gulf to indemnify them should the subsidiary insurer be unable to meet its obligations to them. All of the subsidiary's premium income came from related parties except for 2 percent in one of the two tax years involved.[19]

The Third Circuit discussed the necessity of risk shifting and risk distribution for insurance to exist and noted that interdependent agreements must be considered together. The court determined that the undercapitalization of the insurer and the guarantees executed by the parent indicated that risk did not shift. The court viewed *Humana* as distinguishable on the basis that *Humana* did not involve an undercapitalized insurer or guarantees executed by the parent company.

The court noted that the Tax Court in prior decisions held that risk does not transfer in circumstances where a wholly-

---

**19.** The tax years at issue in the litigation were     1974 and 1975.

owned subsidiary does not insure parties unrelated to the parent company. In the present case, the Tax Court was divided over the effects of unrelated business on risk shifting. The appeals court stated that it need not reach this issue since it was clear that "because of the guarantee to the primary insurers, Gulf and Insco [the subsidiary insurer] did not truly transfer the risk, nor was there a de facto risk distribution to third parties, elements crucial to the allowance of a premium deduction." 914 F.2d at 412.

Subsequent to *Gulf* the Tax Court established a three-step analysis to determine if insurance existed in cases wherein the subsidiary insurer did business for parties unrelated to the parent and its affiliates. These cases are *Sears, Roebuck & Co. v. Commissioner*, 96 T.C. 61, 1991 WL 4979 (1991), *as modified*, 96 T.C. 671, 1991 WL 61250 (1991); *The Harper Group v. Commissioner*, 96 T.C. 45, 1991 WL 4980 (1991); and *AMERCO v. Commissioner*, 96 T.C. 18, 1991 WL 4981 (1991). The Tax Court analysis, based on *Le Gierse*, involves "presence of insurance risk," "risk shifting and risk distributing," and "commonly accepted notions of insurance."

With respect to "presence of insurance risk" the Tax Court stated the following:

> Basic to any insurance transaction must be risk. An insured faces some hazard; an insurer accepts a premium and agrees to perform some act if or when the loss event occurs. If no risk exists, then insurance cannot be present. "Insurance risk" is required; investment risk is insufficient. If parties structure an apparent insurance transaction so as to effectively eliminate the effect of insurance risk therein, insurance cannot be present.

*AMERCO*, 96 T.C. at 38–39. With respect to "risk shifting and risk distributing," the Tax Court stated that while *Le Gierse* established that insurance requires risk shifting and risk distributing, *Le Gierse* did not define these terms. The Tax Court relied on the Tenth Circuit's decision in *Beech Aircraft* for the following definition: " 'Risk-shifting' means one party shifts his risk of loss to another, and 'risk-distribut-

ing' means that the party assuming the risk distributes his potential liability, in part, among others." *Harper*, 96 T.C. at 58–59, and *AMERCO*, 96 T.C. at 40 (quoting *Beech Aircraft*, 797 F.2d at 922). With respect to the third requirement of "commonly accepted notions of insurance," the Tax Court did not discuss how to apply the requirement. The court dealt with this requirement by applying the facts of each case to determine if insurance existed in a commonly understood manner.

*Sears* involved a wholly-owned subsidiary insurer of Sears, Roebuck and Co. ("Sears"). The subsidiary insurer, Allstate Insurance Company ("Allstate"), was licensed in 40 states. While the subsidiary insured 10–15 percent of the parent company's risk, the premiums received from this business only amounted to 0.25 percent of the premiums earned by the subsidiary insurer for the years in issue. The other 99.75 percent of the subsidiary's premiums were received from policyholders unrelated to the parent.

The Tax Court, employing its three-step analysis, concluded that payments by Sears to the subsidiary constituted insurance. The court found that the claims involved—claims relating to injuries to persons on the parent's premises or by the parent's vehicles—established the presence of insurance risk. Risk shifting existed in both form and substance: in form because insurance contracts were written; premiums were transferred; losses were paid; and the subsidiary insurer was a separate, viable entity financially capable of meeting its obligations—in substance because the insurer's business relationship with its parent was the same as its business relationship with unrelated insured parties. The scope of the subsidiary's business demonstrated the presence of risk distribution. Finally, the court determined insurance to be present, in the commonly accepted sense, based on the arrangements between the parent and subsidiary being understood as insurance for non-tax purposes and there being no justification to look at such arrangements differently for tax purposes.

*Harper* involved a subsidiary insurer incorporated in Hong Kong. The parent company, The Harper Group ("Harper"), was a holding company that owned several subsidiaries. The subsidiary insurer shared facilities and employees with another subsidiary of the parent. The subsidiary insurer provided insurance to the parent's domestic and foreign subsidiaries and to customers of two of the parent's subsidiaries. The customers were parties unrelated to the parent, and the premiums received from these unrelated parties approximated 30 percent of the subsidiary's premiums for the years in issue.

The Tax Court in *Harper* concluded through its three-step analysis that premiums received by the subsidiary insurer from related parties constituted insurance. The court determined insurance risk to exist, stating that the transfer of risk to the insurer and the exposure of the insurer were "real, not illusory." 96 T.C. at 58. The court found risk shifting to exist based on the following facts: Insurance contracts were written; premiums were paid; claims were paid; related parties' premiums were negotiated at arm's length; and the subsidiary insurer was a separate entity, regulated under the laws of Hong Kong and financially capable of meeting its obligations. The court considered that risk distribution existed, finding that unrelated business approximating 30 percent was sufficient to provide risk distribution. Finally, the court determined insurance to exist in the commonly accepted sense, listing as relevant factors the following: The subsidiary insurer was organized and operated as an insurance company and was regulated by Hong Kong insurance law, the insurer's capitalization was adequate, premiums were negotiated at arm's length, and the policies issued by the insurer were valid and binding.

*AMERCO* involved a subsidiary insurer incorporated in Arizona. The parent Company, AMERCO, was a holding company with one to three employees during the years at issue. AMERCO filed consolidated tax returns with approximately 250 of its subsidiaries. These subsidiaries were a primary component of the U–Haul rental system. The subsidiary insurer was not included in AMERCO's consolidated returns. The subsidiary insurer had gross written premiums attributable to parties unrelated to the parent in the range of 52 to 74 percent during the seven years at issue.

The Tax Court concluded that the premiums paid by parties related to AMERCO constituted insurance. The court determined that risk existed, stating that the insured parties faced potential hazards. The court found there to be technical risk shifting and risk shifting in substance: technical because insurance contracts were written; premiums were paid; claims were paid; and the insurer was a separate, viable entity, financially capable of meeting its obligations, licensed and operating under many states' insurance laws—in substance because of the substantial business the insurer wrote for parties other than AMERCO. Risk distribution was present based on the diverse, multifaceted, and substantial unrelated business of the insurer. Finally, the court found that insurance existed in the commonly accepted sense, emphasizing the technical and substantive nature of the transactions and the state regulators' view of such transactions as insurance.

2. The case law demonstrates the different issues that have been presented to courts on the overriding question of whether payments by a parent to a subsidiary insurer constitute insurance. A consensus on a precise definition of insurance does not emerge from these opinions. At trial plaintiff presented an expert witness to define "insurance." Defendant did not tender such a witness. Dr. Neil A. Doherty testified for plaintiff as an expert on the economics of insurance. Dr. Doherty is a professor at the Wharton School at the University of Pennsylvania where he primarily teaches classes on insurance and risk management. He has written several books and numerous articles for academic journals on the topic of insurance. Dr. Doherty testified as an expert witness in the trilogy of Tax Court cases discussed above.

Dr. Doherty described insurance as "an institution whereby a number of individuals or firms transfer their premiums and their exposures to loss to a common fund, and the common fund is then available to pay for the losses of whoever might suffer them." He stated that the risk dimension that is being transferred is the unpredictability or variability of loss and not the expected loss or long run average cost.[20] Under the statistical principle of the law of large numbers, risk or variability is reduced by increasing the number of policies in a common fund.

Dr. Doherty asserted that when the only business of a captive insurer is that of insuring its parent, the risk for the parent is the same as it would be if the parent had self-insured by setting aside funds to cover possible losses. In neither case is risk reduced for the parent; the two scenarios therefore did not conform to Dr. Doherty's definition of insurance. He then demonstrated that when a captive insurer underwrites insurance for both its parent and unrelated parties, risk is lower for the parent than it would be if the parent was self-insured. Under the axiom of the law of large numbers, risk is reduced when the number of policyholders is increased by the captive insurer.[21]

In his analysis Dr. Doherty distinguished between ownership risk and policyholder risk. He described the latter as the risk the parent transferred to the subsidiary. Ownership risk, he asserted, is the investment risk or the level of risk that exists after combining all the policies written by the insurer. Dr. Doherty illustrated that the policyholder risk and the ownership risk would be the same only if an insurer did not write any unrelated business. He demonstrated how the ownership risk is reduced the greater the amount of unrelated business that is written by the insurer. Dr. Doherty described the owner as the one that takes the equity interest in the profit or loss of the pool after the insurance function of the arrangement is completed. He stated that the capital of the company serves as a second line of defense to cover losses if premiums are not sufficient to pay out claims.

It was Dr. Doherty's expert opinion that the premiums paid by plaintiff and its subsidiaries to Mentor constituted insurance. He stated that the percentage of unrelated business by Mentor was economically significant in terms of risk reduction. He determined that unrelated business was approximately 44 percent of Mentor's business for 1974 and 66 percent for 1975. According to the witness, the risk reduction created by this unrelated business was sufficient to qualify the premiums paid to Mentor by plaintiff and its subsidiaries as insurance.[22]

This court must adhere to the principles of *Le Gierse* and *Moline Properties* in reaching a decision. Plaintiff and Mentor must be considered as separate entities in evaluating whether the transactions between the two companies resulted in risk shifting and risk distributing. However, if the business operations of Mentor are a sham, Mentor's "corporate form may be disregarded." *Moline Properties*, 319 U.S. at 439, 63 S.Ct. at 1134. Furthermore, even if plaintiff and Mentor are separate

---

**20.** The expected loss is the average loss expected to occur over a period of time. The insurance company charges a premium that will cover the expected loss. Thus, the risk of the expected loss theoretically is not transferred, since the insured pays an amount through a premium that covers the expected loss.

**21.** Dr. Doherty noted an additional distinction between a captive insurer's underwriting only for its parent and a captive insurer's underwriting for unrelated parties. He stated that when unrelated parties are involved, the parent company does not have the same level of control over the insurer's funds, since such funds must

be available to meet all the parties' claims and thus are not available to the parent to spend in whatever manner it wishes.

**22.** Dr. Doherty also determined that Mentor was adequately capitalized, but stated that this was not a crucial factor to his determination of whether the premiums by plaintiff and its subsidiaries constituted insurance. In his view, inadequate capitalization would not negate the existence of insurance, but, rather, would reduce its effectiveness, since there would be greater risk to the policyholders than in the case of adequate capitalization.

entities, if plaintiff retained the risk of the losses against which it insured, plaintiff's premiums amounted to a reserve for losses, and plaintiff would not be entitled to deduct such premiums from taxable income. *Beech Aircraft*, 797 F.2d at 922 (citing *United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673, 676 (10th Cir.1964), and *Spring Canyon Coal Co. v. Commissioner*, 43 F.2d 78, 79 (10th Cir. 1930), *cert. denied*, 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555 (1931)).

■ 3. The court turns first to the issue of whether the separate status of Mentor was a sham. Defendant attempted at trial to establish that Mentor's operations were controlled by plaintiff and that Mentor's existence was therefore a sham. Defendant was unsuccessful in this endeavor and in post-trial closing argument abandoned the contention that Mentor was a sham. Nevertheless, the court believes it useful to elaborate on the facts that demonstrate Mentor's valid business existence. These facts establish two of the three factors found by the Tax Court to illustrate the existence of insurance: "presence of insurance risk" and "commonly accepted notions of insurance."

Several factors contribute to recognizing Mentor as a valid insurance company. The parties that insured with Mentor, both plaintiff and unrelated parties, truly faced hazards. Events such as hurricanes and accidents were real possibilities and could result in losses to the insured parties. The business underwritten by Mentor was understood to be insurance provided by Mentor. Insurance contracts were written and premiums were paid. Unrelated parties purchased reinsurance from Mentor. Unrelated parties co-insured a portion of the direct insurance Mentor wrote for plaintiff. Unrelated parties reinsured policies that Mentor wrote for plaintiff. Premiums charged to plaintiff and unrelated parties were based on the commercial rates in London. The validity of claims was established before payments were made on them. Claims were paid from funds of Mentor that were maintained separately from plaintiff's funds. Mentor's capitalization was adequate, and the policies it entered into were valid and binding. Mentor's business operations were separate from plaintiff's.[23] Cumulatively, these facts indicate that Mentor's existence as an insurance company was valid and not a sham.

■ Having established Mentor was not a sham, the next question to be addressed is whether plaintiff shifted its risk to Mentor through its arrangements with Mentor. In order to determine if risk is shifted, it is necessary to identify the risk that is shifted in the insurance context. The case law previously discussed does not delve into the connotation given to risk by the various courts. The Tax Court asserts that insurance risk must be present, but does not define the risk that parties insure against. The Tax Court's assertion that there must be the chance of an event occurring that will cause a loss to the insured party addresses the issue of whether the business is a sham rather than the definition of risk. The other courts use terms such as "risk of loss" or "risk of adverse economic consequences," without elaborating on their meaning. Thus, the prior case law does not provide a definitive answer to the question of the risk that is shifted by insured parties.

The court found Dr. Doherty's testimony helpful on this point. Dr. Doherty explained how insurance operates and clarified what the risk element is that insurance premiums guard against. Insurance protects against the variability of loss. An insured party pays a premium that is expected to cover the average loss. Therefore, the insured party does not transfer the cost of the average loss, since the insured party pays that amount to the insur-

**23.** Defendant questioned the separate status of Mentor and plaintiff based, in part, on the overlap in several key employees and officers and on plaintiff's control over the investment of some of Mentor's funds. Defendant cited no case law supporting the proposition that either factor would serve to negate the separate status of plaintiff and Mentor. Having examined all the factors, the court finds that Mentor's business operations were separate from those of plaintiff.

er. What the insured party transfers to the insurer when it pays premiums is the cost of variability in losses. The risk that the insured transfers to the insurer is the variability of loss, not the complete loss from an event, such as a hurricane or an accident, since the insured pays a premium that covers the average cost of the complete loss.

Plaintiff paid premiums to Mentor, and Mentor thereby became liable for claims of loss on the insured property. When plaintiff experienced a loss, a claim was filed with Mentor and Mentor paid the claim out of its own funds, funds that were separate from plaintiff's funds. However, because Mentor was a subsidiary of plaintiff, any expense of Mentor, such as payment of a claim, would reduce the assets of plaintiff. If this court were to rely on *Stearns–Roger* or *Mobil*, this fact alone would be sufficient to find that risk did not transfer from plaintiff to Mentor. Both *Stearns–Roger* and *Mobil* concluded that risk did not transfer from parent to subsidiary because the parents' assets were diminished by casualty losses when the subsidiary paid off a claim on the loss.[24] The court does not consider these decisions to offer the correct approach to the present case. To follow *Stearns–Roger* or *Mobil* would be to ignore the effect that unrelated business underwritten by Mentor has on the level of risk.

Unrelated business operated to reduce the amount of risk to which plaintiff was exposed. When plaintiff purchased insurance from Mentor, plaintiff transferred to Mentor a certain level of risk or a certain amount of variability of loss. Because Mentor had unrelated business, this level of risk was not retained by plaintiff, the parent of Mentor. The considerable amount of unrelated business, approximately 44 and 66 percent during the years in issue, caused a significant reduction in risk. Plaintiff as the parent of Mentor thus shouldered a level of risk significantly lower than the level of risk that it initially transferred to Mentor. Consequently, the risk transferred to Mentor and the risk ultimately borne by plaintiff were not the same, and plaintiff's premiums constituted the transfer of risk.

If the level of risk plaintiff initially had transferred and the level of risk plaintiff ultimately had shouldered were virtually the same, plaintiff's risk effectively would not have transferred. However, this situation is not present in the case at bar, and plaintiff's payment of premiums to Mentor did amount to a transfer of risk. The court does not address the question of what amount of unrelated business is necessary to result in transfer of risk. The court notes that the Tax Court found transfer of risk in situations where unrelated business was 30, 52 to 74, and 99 percent. The percentage of unrelated business present here, 44 and 66 percent, is within the range of unrelated business found by the Tax Court's decisions to constitute transfer of risk.

Unlike this court's analysis, the Tax Court's discussions of risk transfer did not focus solely on the amount of unrelated business. The Tax Court's decisions concluded that risk shifting occurred based on

---

**24.** The other cases discussed above that did not find transfer of risk did not base their conclusions solely on the existence of the parent/wholly-owned subsidiary relationship and can be distinguished from the present case. The finding of no risk transfer in *Carnation* was based, in part, on the parent company's agreement to further capitalize the insurer. No such agreement is present here. The finding of no risk transfer in *Beech Aircraft* was based on the fact that the liability of the insurer for the parent's losses could not exceed the amount paid in premiums by the parent, supplemented by interest. That situation is not present here. *Clougherty* made specific reference to the fact that assets of the parent were reduced by the exact amount of the casualty loss experienced by the parent because no outside business was written by the insurer. Thus, *Clougherty* distinguishes itself from the present case. To the extent *Humana* determined risk transfer to not be present, it based its findings on *Clougherty* and *Carnation*, and is distinguishable for the same reasons as these cases. The finding of no risk transfer in *Gulf* was based on the insurer's being undercapitalized and on the presence of guarantees by the parent. These factors are not present here. (The court does not consider one guarantee executed by plaintiff after the years in issue to be evidence of guarantees by plaintiff for the years in issue.)

some of the following factors: Insurance contracts were written; premiums were paid; claims were paid; the insurer operated as a separate, viable entity, financially capable of meeting its obligations; the insurer wrote substantial unrelated business; and the insurer was regulated under insurance laws. The only factor in this list not established at trial was that Mentor was regulated under insurance laws.[25] The court does not find that the absence of this factor negates the existence of insurance. Although during the years at issue, the Bermuda law under which Mentor was regulated was general corporation law, rather than specifically insurance law, Mentor effectively was regulated by the insurance industry itself.[26] Unrelated parties would reinsure and co-insure with Mentor only if they viewed Mentor as financially sound, since they would be liable if Mentor was unable to meet its obligations. Thus, Mentor was required to maintain financial stability if it desired to undertake business with unrelated parties. Mr. Carter's testimony on this point was unimpeachable. The significant amount of unrelated business underwritten by Mentor during the years in issue illustrates Mentor's success in meeting the industry's standards of a viable business. Because the factors that led the Tax Court to conclude that risk shifting occurred in its decisions are also present in this case, the court finds risk shifting to be present under the Tax Court's analysis, in addition to being present under this court's own analysis.[27]

Since risk shifting was present, the next question to be addressed is whether risk distribution occurred. Risk distribution involves spreading the risk of loss among policyholders. Mentor had unrelated business of approximately 44 and 66 percent for the two years at issue. This amount of unrelated business sufficiently spreads risk so as to constitute risk distribution. The court notes that the Tax Court found risk distribution to exist in *Harper* where unrelated business approximated only 30 percent.

Since risk shifting and risk distributing were present, the court finds that insurance exists as outlined in *Le Gierse.* Thus, the payments by plaintiff to Mentor constituted insurance and were allowed to be deducted from taxable income.

4. Other arguments raised by defendant were considered and found to be without merit. Defendant's argument regarding the inconsistency of *Humana* with Federal Circuit law is deemed irrelevant to this decision because this court does not rely on *Humana.* Nevertheless, the court notes that it does not agree with defendant's assertion that plaintiff and the subsidiaries with which it filed a consolidated return must be treated as a single entity under *Exxon Corp. v. United States*, 785 F.2d 277 (Fed.Cir.1986), despite *Moline Properties. Exxon*, in stating that those who file a consolidated return must be treated as a single entity, quotes *American Standard, Inc. v. United States*, 220 Ct.Cl. 411, 602 F.2d 256 (1979). 785 F.2d at

---

**25.** Defendant argued that the terms of business were different for plaintiff and unrelated parties since plaintiff's policies were for direct insurance and unrelated parties' policies were for reinsurance. Defendant's contention is not persuasive. Direct insurance and reinsurance are both considered insurance, and the premiums charged on both types of policies were based on commercial rates in London. The court finds that Mentor underwrote business for plaintiff and unrelated parties on the same terms.

**26.** From evidence presented at trial, it appeared that Bermuda did not have laws specific to regulating insurance until after the years in issue.

**27.** The court did not find convincing defendant's distinctions of the Tax Court's cases. The factors that the Tax Court relied on in concluding that risk shifting occurred are present in this case, except for regulation by insurance laws. Each of the three Tax Court cases, *Sears, Harper,* and *AMERCO,* listed some, but not all, of the factors listed above. The court does not read the Tax Court cases as creating specific criteria that must exist for risk shifting to occur between a parent and a subsidiary. Rather, the Tax Court's intention was to examine all the factors of a particular case together to determine if risk shifting was present. This court analyzed all the facts of this case and determined that risk shifting occurred within the Tax Court's meaning of risk shifting.

280. *American Standard* specifically states with respect to the proposition quoted in *Exxon*, "The single entity framework does not mean that all items of income, deductions, and credit for the affiliated corporations are combined into single accounts as if the corporations were one. The consolidated return regulations, in fact, primarily deal with the affiliated corporations as separate corporate entities...." *American Standard*, 220 Ct.Cl. at 418, 602 F.2d at 261. Thus, *American Standard* and *Exxon* do not require disregarding the separate status of affiliated entities and do not conflict with *Moline Properties*. Furthermore, to the extent they might, *Moline Properties* as a Supreme Court decision would override such contrary decisions by lower courts.

■ This court also views as without merit defendant's argument that plaintiff's payments to Mentor are not deductible under *Commissioner v. Lincoln Savings & Loan Ass'n*, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971), based on their serving to create or enhance a separate asset for plaintiff. The funds in *Lincoln Savings* that were determined to constitute an asset are clearly distinguishable from the premiums paid by plaintiff. In *Lincoln Savings* the funds that were determined to be an asset were a "prepayment with respect to future premiums," 403 U.S. at 348, 91 S.Ct. at 1896; if such funds were converted to actual premiums or "used to pay losses," the funds became deductible. *Id.* at 358, 91 S.Ct. at 1900. In the present case the payments by plaintiff were actual premiums, not prepayments of future premiums. Furthermore, the insured parties in *Lincoln Savings* had a "property interest" in the funds constituting future premiums, earned a return on the funds, and in certain situations could receive funds back. *Id.* at

355, 91 S.Ct. at 1899. Plaintiff's payments were placed into a pool of funds used to pay claims of the insurer, and plaintiff did not maintain a property interest in these payments.

## II. *Insurance of United States risks*

■ The second issue to be addressed is whether the court's determination that plaintiff's premiums to Mentor constituted insurance results in plaintiff's owing taxes because the premiums received by plaintiff's subsidiary, Mentor, were for insurance of property located in the United States.[28]

Under I.R.C. § 951 a United States shareholder must include in gross income his pro rata share of a controlled foreign corporation's subpart F income. I.R.C. § 952(a)(1) includes as subpart F income "the income derived from the insurance of United States risks (as determined under section 953)." I.R.C. § 953(a) provides the following:

(a) General rule.

For purposes of section 952(a)(1), the term "income derived from the insurance of United States risks" means that income which—

(1) is attributable to the reinsurance or the issuing of any insurance or annuity contract—

(A) in connection with property in, or liability arising out of activity in, or in connection with the lives or health of residents of, the United States.... [29]

Under I.R.C. §§ 951–953, if the premiums paid by plaintiff to Mentor were for insurance of property located in the United States or for liability arising out of activity in the United States, these premiums should have been included in plaintiff's gross income for the years in which the payments were received by Mentor. The

28. References in the discussion below to sections of the Internal Revenue Code are to the sections as they existed in 1974 and 1975, unless otherwise noted.

29. In 1986 Congress amended I.R.C. §§ 952–953 and substituted "insurance income" for "income derived from the insurance of United States

risks." Thus, the issue addressed in this opinion, the meaning of United States risks, is not relevant for insurance income earned subsequent to the effective date of the 1986 amendment. "The product of a judge's labor in tax cases frequently is as ephemeral as the subject is arcane." Anon. Judge.

insured property at issue was located over the Outer Continental Shelf of the Gulf of Mexico. Plaintiff and defendant disagree as to whether the Outer Continental Shelf is a part of the United States for purposes of I.R.C. § 953(a).

I.R.C. § 7701 sets forth general definitions for the Internal Revenue Code. Section 7701(a)(9) provides the following:

(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

. . . .

(9) United States.

The term "United States" when used in a geographical sense includes only the States and the District of Columbia.

The regulations for section 953 provide, in pertinent part: "For purposes of section 953(a), the term 'United States' is used in a geographical sense and includes only the States and the District of Columbia...." Treas.Reg. § 1.953–2 (1964). Thus, section 7701(a)(9) and the regulation applicable to section 953 do not include the Outer Continental Shelf as a part of the United States. If the court were to rely solely on section 953, its applicable regulation, and section 7701, the court would conclude that plaintiff's payments were not insurance of United States risks.

█ Defendant contends that the court must look beyond section 953 and its pertinent regulation to I.R.C. § 638 and its regulations. Section 638 was enacted in 1969 and provides, in pertinent part, as follows:

Continental shelf areas.

For purposes of applying the provisions of this chapter (including sections 861(a)(3) and 862(a)(3) in the case of the performance of personal services) with respect to mines, oil and gas wells, and other natural deposits—

(1) the term "United States" when used in a geographical sense includes the seabed and subsoil of those submarine areas which are adjacent to the territorial waters of the United States and over which the United States has exclusive rights, in accordance with international law, with respect to the exploration and exploitation of natural resources....

Defendant argues that I.R.C. § 638 operates to include the Outer Continental Shelf as a part of the United States for purposes of section 953. According to defendant, reference to "this chapter" in section 638 is a reference to Chapter 1 of the Internal Revenue Code, encompassing I.R.C. §§ 1–1399, and the language "with respect to the exploration and exploitation of natural resources" in section 638 refers to any activity relating to exploration and exploitation, including insurance of mobil drilling rigs. In support of its position that section 638 is intended to apply to insurance activities, defendant cites an example in the Treasury Regulations for section 638 that indicates insurance income from a platform attached to the Outer Continental Shelf "is income derived from the insurance of United States risks, within the meaning of section 953(a)(1)(A)." Treas.Reg. § 1.638–1(f) (1973).

Plaintiff responds that I.R.C. § 638 operates to include the Outer Continental Shelf as a part of the United States only when the activity involved is the actual exploration and exploitation of natural resources or the personal services performed on mines, oil and gas wells, and other natural deposits. Plaintiff asserts that the language of section 638 clearly reinforces its contention and, furthermore, that the legislative history of section 638 illustrates that the intention of Congress through enactment of section 638 was to determine the source of income from actual mining activities. The report of the Senate Committee on Finance states with respect to enactment of section 638:

Present law.—Present law is not explicit as to *whether for purposes of the exploration for, or exploitation of, natural resources* in the continental shelf area of a country over which the country exercises tax jurisdiction under the principles of international law, that area is considered for U.S. tax purposes as a part of the country.

General reasons for change.—The development of natural resources in the

continental shelf areas of the world makes the status of these areas for tax purposes of increasing importance. This status is important, for example, in determining the *source of income from mining activities* conducted in continental shelf areas.... Accordingly, the committee believes it appropriate to clarify the status of continental shelf areas with regard to the application of the income tax provisions of the code to *natural resource activity.*

Explanation of provision.—... [W]ith respect to mines, oil and gas wells and other natural deposits, the term "United States" when used in a geographical sense includes the seabed and subsoil of the submarine areas adjacent to the territorial waters of the United States ... with respect to the exploration and exploitation of natural resources.

[W]ages or salaries received for *personal services performed* on a mine or oil or gas well located or being developed on the Continental Shelf of the United States constitute income from sources within the United States.

S.Rep. No. 91–552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Admin.News 1645, 2027, 2223 (emphasis added).

Courts "must defer to Treasury Regulations that 'implement the congressional mandate in some reasonable manner.'" *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967)); *Thomas Int'l Ltd. v. United States,* 773 F.2d 300, 303 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986) (quoting *Portland* ). Where there is a doubt as to the meaning of the statutory language "an examination of the legislative history, for whatever illumination it may shed, is necessary." *Ellis First Nat'l Bank of Bradenton v. United States,* 213 Ct.Cl. 44, 55–56, 550 F.2d 9, 15 (1977). "In the interpretation of statutes levying taxes it is the established rule not

to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen." *Estate of Renick v. United States,* 231 Ct.Cl. 457, 463, 687 F.2d 371, 376 (1982) (quoting *Gould v. Gould,* 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917) (citations omitted)).

The court carefully examined the above statutes and regulations to determine the applicability of I.R.C. § 638 to § 953. The court concludes that rules of statutory interpretation support a construction that section 638 does not affect section 953. First, the specific references in the legislative history to "purposes of the exploration for, or exploitation of, natural resources," "source of income from mining activities," "natural resource activity," and "personal services performed" are references to mining activities and to personal services performed at mining sites, not to insurance activities. Second, it is unlikely that the statutory language "this chapter" is intended to be so broad as to include any type of activity that relates to mining in I.R.C. §§ 1–1399. Persuasive to this end is the fact that the statute specifically states that "this chapter" includes "the performance of personal services." This reference would not have been necessary were section 638 to apply to all activities that have any relationship to mining in Chapter 1, since the performance of personal services is a part of Chapter 1. Third, because insurance activity is more remote to mining activity than personal service activity conducted at the site of exploration, it seems likely that if Congress had intended for section 638 to apply to insurance activity, Congress would have made specific reference to that activity since Congress made specific reference to personal service activity. Fourth, I.R.C. § 953, and not section 638, explicitly relates to insurance activity. Moreover, the accompanying regulation to section 953, even after amendment in 1980, maintained that the United States includes only the States and the District of Colum-

bia.[30] Fifth, the sections of the Internal Revenue Code that precede section 638, I.R.C. §§ 611–636, are related to actual mining activities, not to insurance activities. Finally, if there is a doubt as to the meaning of the provisions of the Internal Revenue Code, the doubt "must be resolved in favor of the taxpayer." *Citizens Nat'l Bank of Waco v. United States,* 213 Ct.Cl. 236, 255, 551 F.2d 832, 843 (1977) (citing *Porter v. Commissioner,* 288 U.S. 436, 442, 53 S.Ct. 451, 453, 77 L.Ed. 880 (1933), and *United States v. Merriam,* 263 U.S. 179, 188, 44 S.Ct. 69, 71, 68 L.Ed. 240 (1923)). Thus, if a doubt exists as to the applicability of section 638 to insurance activities, it must be resolved against the IRS position in order to favor plaintiff taxpayer. Although the court does not consider this last factor determinative, the foregoing factors, cumulatively, fully support the conclusion that I.R.C. § 638 is not applicable to section 953. The premiums paid to Mentor by plaintiff were not for insurance of United States risks since the insured property was located over the Outer Continental Shelf which is not a part of the United States for purposes of I.R.C. § 953.[31]

## CONCLUSION

Based on the foregoing, plaintiff has established its entitlement to a refund of federal corporate income taxes. The parties shall file a stipulation as to the amount of refund by February 28, 1992, after which the Clerk of the Court shall enter judgment accordingly. Plaintiff shall have its costs.

IT IS SO ORDERED.

30. The example provided in the regulations to section 638, indicating section 638 is to apply to insurance activity, cannot override the regulations to section 953.

31. Having determined for the reasons given above that the premiums paid by plaintiff were not for insurance of United States risks, the court need not address the other issues raised by plaintiff, including the role of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1343 (1970) (originally enacted in 1953). It is noted that, to the extent possible, tax questions should be resolved within the Internal Revenue Code itself, without reference to other statutes.